EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Partido Nuevo Progresista<br><br>Recurrido<br><br>v.<br><br>Jorge de Castro Font, Migdalia Padilla Alvelo, Luz Z. Arce Ferrer y Carlos Díaz Sánchez<br><br>Peticionarios | Certificación<br><br>2007 TSPR 230<br><br>172 DPR \_\_\_\_ |

Número del Caso: CT-2007-7

Fecha: 27 de diciembre de 2007

Abogados de la Parte Peticionaria:

                    Lcda. Verónica Ferraiuoli
                    Lcdo. Rubén T. Nigaglioni

Abogados de la Parte Recurrida:

                    Lcdo. José A. Carlo Rodríguez
                    Lcdo. Félix R. Passalacqua Rivera

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Nuevo Progresista

    Recurrido

       v.

                             CT-2007-7        Certificación

Jorge de Castro Font, Migdalia
Padilla Alvelo, Luz Z. Arce
Ferrer y Carlos Díaz Sánchez

    Peticionarios

Opinión del Tribunal emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 27 de diciembre de 2007.

> *"Las fuerzas que compiten entre sí dentro de un partido político emplean la campaña primarista y la elección primarista para finalmente arreglar sus diferencias […] Una primaria no es hostil a las luchas intra-partidistas; de hecho, son el foro ideal para resolverlas."* Eu. v. San Francisco County Democratic Central Committee, 489 U.S. 214 (1989). (Traducción nuestra)

El presente caso es una secuela de McClintock v. Rivera Schatz, res. 12 de junio de 2007, 2007 TSPR 121, en donde declaramos nulas las sanciones impuestas por el Partido Nuevo Progresista (en adelante, PNP) en contra de los Senadores Kenneth McClintock Hernández, Jorge de Castro Font, Migdalia Padilla Alvelo, Luz Arce Ferrer y Carlos Díaz Sánchez (en adelante, los

Senadores o peticionarios). Después de dicha decisión, el PNP "no cualificó" a los Senadores como aspirantes a primarias, y presentó ante el Tribunal de Primera Instancia una querella de descalificación. El foro de instancia la declaró con lugar. De dicha decisión los peticionarios recurren ante nos vía certificación.

Por entender que **la primaria es el foro más adecuado y democrático para resolver esta disputa entre electores afiliados al PNP**, y que la descalificación fue un subterfugio para eludir las consecuencias del dictamen emitido en McClintock v. Rivera Schatz, *supra*, revocamos la sentencia apelada y ordenamos la certificación de los Senadores como aspirantes en la contienda primarista a celebrarse el 9 de marzo de 2008.

## I

Los peticionarios, De Castro Font, Padilla Alvelo, Arce Ferrer y Díaz Sánchez fueron electos Senadores bajo la insignia del PNP en los comicios electorales celebrados en Puerto Rico el pasado 2 de noviembre de 2004. Como resultado de un conflicto interno, el PNP celebró un proceso disciplinario contra ellos y contra el Senador Kenneth McClintock Hernández. Dicho proceso finalizó con la imposición de diversas sanciones a éstos, entre las cuales figuraron el relevo de toda posición de liderazgo, la expulsión y la prohibición de aspirar a cargos electivos bajo la insignia de la colectividad. En McClintock v. Rivera Schatz, *supra*, declaramos la ilegalidad de dicho

proceso, así como la nulidad de las sanciones impuestas a raíz del mismo.

Así las cosas, cuando los Senadores (con excepción del Senador McClintock Hernández) presentaron sus solicitudes para figurar como aspirantes en las primarias de la colectividad, ciertos miembros del PNP se querellaron en su contra ante el Comité de Evaluación de Aspirantes a Cargos Públicos Electivos (en adelante, Comité de Evaluación). Dichas querellas fueron atendidas y declaradas Con Lugar por el Comité de Evaluación.

En esencia, el Comité de Evaluación pasó juicio sobre numerosos cargos en contra de los Senadores basados en alegadas violaciones al Reglamento del PNP y a los acuerdos de la colectividad. Se alegó que ellos violaron el acuerdo de la Asamblea General y del *Caucus* del PNP en el Senado, dirigido a seleccionar al Dr. Pedro Rosselló González para sustituir al Senador McClintock Hernández como Presidente de dicho cuerpo.

Tras celebrar vistas separadas para atender las querellas, el Comité de Evaluación concluyó que los Senadores incumplieron con el mandato de la colectividad de sustituir al Senador McClintock Hernández por el Senador Rosselló González como Presidente del Senado. A base de lo anterior, dicho Comité resolvió que éstos violaron el Reglamento del PNP al no acatar sus decisiones institucionales y que, como consecuencia de ello, se "desafiliaron voluntariamente" de la colectividad. Por

ende, concluyó que éstos no pueden figurar en el Registro de Electores Afiliados del PNP, por lo que le recomendó al PNP "no cualificar" a los Senadores como aspirantes bajo la insignia del partido. Dicha recomendación fue acogida por el Directorio del PNP.

Mientras ocurría este proceso, los Senadores presentaron ante el Tribunal de Primera Instancia diversas solicitudes dirigidas a lograr que se pusiera en vigor el dictamen emitido en McClintock v. Rivera Schatz, *supra*. Por su parte, el PNP presentó ante dicho foro una querella solicitando su descalificación como aspirantes a primarias de la colectividad. El PNP fundamentó su solicitud, precisamente, en la Resolución del Comité de Evaluación.

Trabada la controversia, el foro de instancia concluyó que el Comité de Evaluación no tiene autoridad para conducir un procedimiento disciplinario y que, por tanto, "no podía el Directorio darle la vuelta a la Opinión del Tribunal Supremo en el caso […] McClintock v. […] Rivera Schatz, *supra*, para emitir una decisión de expulsión disfrazada de desafiliación voluntaria". A pesar de ese reconocimiento, el tribunal entró a considerar el alcance del derecho a disentir que cobija a los Senadores por virtud de la Ley Electoral, *supra*, en contraposición con la libertad de asociación que ampara al PNP. Con respecto a ello, determinó que el derecho a disentir de los Senadores no puede tener un rango de mayor jerarquía que el del PNP a mantener su integridad, disciplina y unidad, "porque de lo

contrario se plantaría […] una semilla de discordia en el seno del partido". Dicho foro entendió que "[u]na interpretación contraria, violentaría el derecho fundamental de los partidos a la libertad de asociación".

Al amparo del mencionado análisis, el foro de instancia determinó que la decisión del Comité de Evaluación de que los Senadores violaron el Reglamento del PNP no era arbitraria ni irrazonable. En consecuencia, declaró Con Lugar la querella de descalificación.

Inconformes, los Senadores apelaron ante el Tribunal de Apelaciones y, posteriormente, presentaron una Solicitud de Certificación ante nos para que se revise directamente la Sentencia emitida por el foro primario. Los peticionarios alegan que -por virtud del dictamen emitido en McClintock v. Rivera Schatz, *supra*- el PNP está impedido de re-litigar la capacidad de ellos para postularse en primarias bajo la insignia del PNP, toda vez que en dicha Opinión este Tribunal pasó juicio sobre las mismas imputaciones y determinó que la sanción de prohibirles participar en dicha etapa del proceso violenta los derechos que les garantiza la Ley Electoral, *supra*. Consideran éstos que dicho proceder es un subterfugio para burlar la Opinión emitida por este Tribunal.

De otra parte, aducen que procede la revocación de la descalificación decretada en su contra porque el acuerdo que el PNP pretendió poner en vigor no fue sobre un asunto programático y que, además, es contrario al Reglamento del

Senado, que regula el proceso de selección del Presidente de dicho cuerpo. Siendo así, y dado que la Ley Electoral, *supra*, les garantiza el derecho a disentir en asuntos no programáticos ni reglamentarios, entienden que podían disentir en cuanto a este extremo.

Por su parte, el PNP aduce –en síntesis– que, como asociación voluntaria, tiene derecho a decidir quiénes son sus miembros y quiénes no lo son. Sostiene que los Senadores violaron el acuerdo del *Caucus* y de la Asamblea General, por lo que el PNP podía disciplinarlos e imponerles la sanción de negarles figurar como candidatos a primarias bajo la insignia de la colectividad.

Oportunamente, acogimos la Solicitud de Certificación. Conscientes de la necesidad de una pronta solución, y a pesar de que ninguna de las partes lo solicitó, acortamos los términos para la presentación de los alegatos. Tanto el PNP como los Senadores comparecieron dentro del término concedido. A su vez, a petición de los Senadores y en auxilio de nuestra jurisdicción, le ordenamos al PNP paralizar el sorteo que determina las posiciones de los candidatos en las papeletas primaristas de la colectividad, en cuanto a los escaños a los que éstos aspiran. Contando con las posiciones de ambas partes, procedemos a resolver con la mesura que el caso amerita.

En vista de que el presente caso encierra una aparente tensión entre la libertad de asociación del PNP y los derechos garantizados por la Ley Electoral, *supra*, como

cuestión de umbral, entraremos a examinar la validez de la decisión del Comité de Evaluación de dicho partido. Para lograr ese cometido, debemos aclarar los derechos y prerrogativas que, a la luz de las particulares circunstancias de este caso, se le deben reconocer tanto al partido como a los electores afiliados de la colectividad. La controversia ante nos requiere que delimitemos el alcance de la libertad de asociación, el derecho al voto y las secciones pertinentes de la Ley Electoral, *supra*. **Ese ejercicio, claro está, tendrá como norte el valor principal tutelado por la Ley Electoral, *supra*, a saber, el derecho del ciudadano a expresarse mediante el voto.**

## II

### A

Como es sabido, la libertad de asociación es un derecho expresamente reconocido por la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico. El propio texto de la Ley Suprema declara que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 279. En armonía con esta normativa constitucional, hemos expresado que la libertad de asociación es un derecho fundamental que conlleva el derecho a formar agrupaciones y proponer candidatos de su predilección para participar en el proceso electoral. Véase P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400

(1980); <u>García Passalacqua v. Tribunal Electoral</u>, 105 D.P.R. 49 (1976). Véase además, a modo ilustrativo, <u>Sánchez y Colón v. ELA</u>, 134 D.P.R. 503, 508 (1993), opinión de conformidad.

Como corolario de la libertad de organización, la misma Constitución contempla en diversas disposiciones la función protagónica que juegan los partidos políticos en nuestro sistema electoral.[1] De hecho, el sistema republicano de gobierno diseñado por la Ley Fundamental parte de la premisa, en el esquema de representación legislativa establecido por el Artículo III, que los partidos políticos constituyen un elemento integral de nuestro ordenamiento constitucional.

Son las organizaciones políticas las que dirigen el debate sobre los asuntos públicos frente a las contiendas electorales, presentando sus respectivos programas de gobierno y nominando candidatos para ocupar los cargos públicos principales que ofrecen gobernar en consonancia con esos programas. <u>McClintock v. Rivera Schatz</u>, *supra*, pág. 14; <u>P.A.C. v. P.I.P.</u>, res. 29 de diciembre de 2006, 2006 TSPR 193; <u>P.R.P. v. E.L.A.</u>, 115 D.P.R. 631, 638 (1984); <u>Fuster v. Busó</u>, 102 D.P.R. 327, 347 (1974). Todo ello con la anuencia de la Ley Electoral, *supra*, que delega expresamente en tales asociaciones la función inherentemente pública de estructurar algunos aspectos primordiales del esquema electoral, así como autoriza la

---

[1] Véase Const. E.L.A., *supra*, Art. III, Sec. 4, Sec. 7, Sec. 8; Art. V, Sec. 12; Art. VI, Sec. 4.

subvención de una partida significante de los gastos operacionales y publicitarios de los partidos con fondos públicos. Véase 16 L.P.R.A. sec. 3001-3380. Véase además, McClintock v. Rivera Schatz, *supra*, pág. 15; R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, Vol. II, Colegio de Abogados de Puerto Rico, Instituto de Educación Práctica, Inc., 2003, págs. 1205-1206.

A su vez, **la existencia de los partidos políticos en nuestra jurisdicción está intrínsecamente relacionada al derecho al voto**, consagrado expresamente en nuestra Constitución. La Sección 2 de la Carta de Derechos establece el sufragio universal, igual, directo y secreto, y protege al ciudadano contra toda coacción en el ejercicio de esa prerrogativa. Const. E.L.A., *supra*, Art. II, Sec. 2.[2] Este precepto constitucional le concede a todo ciudadano el derecho a participar en el proceso electoral, elemento umbral de nuestro sistema democrático. P.A.C. v. E.L.A. I, 150 D.P.R. 359 (2000).

En nuestro ordenamiento constitucional, el derecho al voto no tan sólo comprende el derecho del elector a votar en las elecciones, **sino que abarca el derecho a que se incluyan en las papeletas las opciones que reflejan las corrientes políticas contemporáneas del elector**. McClintock Hernández v. Rivera Schatz, *supra*, pág. 23-24; P.A.C. v.

---

[2] Véase además, M. Pabón y otros, Los Derechos y los Partidos Políticos en la Sociedad Puertorriqueña, 1ra edición, Río Piedras, Editorial Edil, 1968, págs. 7-11.

E.L.A. I, *supra*, pág. 372; Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84 (1980).[3] Es por ello que el derecho al voto, al igual que la libertad de asociación, comprende el derecho a formar y a afiliarse a agrupaciones políticas con la intención de participar en el proceso electoral.

Ahora bien, aunque es indudable que tanto el derecho a votar de una manera determinada como el derecho a formar asociaciones políticas para propósitos electorales son derechos de carácter fundamental, éstos no constituyen derechos absolutos. P.A.C. v. E.L.A. I, *supra*; Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141 (1997); Democratic Party v. Tribunal Electoral, 107 D.P.R. 1 (1979). La propia Constitución circunscribió estos principios constitucionales al mandato legislativo, al disponer que la Asamblea Legislativa "dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas." Const. E.L.A., *supra*, Art. VI, Sec. 4. Por tanto, hemos reconocido que el Art. VI, Sec. 4 de la Constitución delega a la Asamblea Legislativa un margen de autoridad amplio y abarcador para legislar en asuntos de materia electoral. McClintock v. Rivera Schatz, *supra,* pág. 15; P.A.C. v. P.I.P., *supra*, pág. 22; P.A.C. v. E.L.A. I, *supra*, pág. 372; P.S.P., P.P.D., P.I.P. v. Romero Barceló, 110 D.P.R. 248 (1980); P.N.P. v. Tribunal Electoral, 104 D.P.R. 741 (1976).

---

[3] Véase además, a modo ilustrativo, Lubin v. Panish, 415 U.S. 709 (1979).

**Mediante esta autoridad constitucional, el Estado puede cumplir efectivamente con el interés apremiante de proteger la pureza del proceso electoral y la integridad del sistema democrático. En vista de ello, la Asamblea Legislativa tiene la facultad y la obligación de aprobar aquella reglamentación que salvaguarde el derecho al voto y que propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto, íntegro y democrático.** Véase McClintock v. Rivera Schatz, *supra*, pág. 24; P.A.C. v. E.L.A. I., *supra*, pág. 371; P.S.P. v. Com. Estatal de Elecciones, *supra*, pág. 405-406; P.S.P., P.P.D., P.I.P. v. Romero Barceló, *supra*, pág. 294; P.N.P. v. Tribunal Electoral, *supra*, pág. 749-750.

Por otro lado, los partidos políticos que participan en las elecciones generales están investidos de poderes cuasi-gubernamentales, toda vez que forman parte del organismo directivo de la Comisión Estatal de Elecciones y, a su vez, reciben anualmente cuantiosos fondos públicos del Fondo Electoral, además de los que devengan en el año de las elecciones generales. Al inscribirse como partidos con derecho a nombrar un Comisionado Electoral y recibir fondos públicos para sus gastos, aceptan también la obligación de cumplir con el ordenamiento electoral. Véase McClintock v. Rivera Schatz, *supra*, pág. 15-16. Véase además, a modo ilustrativo, Smith v. Allwright, 321 U.S. 649 (1944).

**B**

A tenor con los principios constitucionales antes señalados, nos corresponde examinar la regulación de los partidos políticos por el ordenamiento electoral y la posible tensión que emana como consecuencia del mismo entre el derecho al voto y la libertad de asociación. **Al examinar esta normativa, partimos de la premisa que ninguna de las partes ha cuestionado la validez constitucional de las disposiciones de la Ley Electoral**, *supra*. En consonancia con nuestros pronunciamientos en McClintock Hernández v. Rivera Schatz, *supra*, reiteramos que la Asamblea Legislativa aprobó esta normativa en aras de salvaguardar la integridad del proceso electoral puertorriqueño, reconociendo la prevalencia de los derechos electorales del ciudadano sobre los derechos y prerrogativas de todos los partidos y agrupaciones políticas. 16 L.P.R.A. sec. 3051 (11).

En primer lugar, la Declaración de Derechos y Prerrogativas de los Electores consagrada en el Artículo 2.001 de la referida ley reconoce "el derecho del elector afiliado aspirante a una candidatura a solicitar primarias de su partido y la celebración de las mismas con arreglo a las garantías, derechos y procedimientos establecidos en este subtítulo". 16 L.P.R.A. sec. 3051 (8). Ya sostuvimos en McClintock Hernández v. Rivera Schatz, *supra*, la validez de dicha disposición, así como la obligación del partido político a participar en un proceso primarista cuando surja

más de un aspirante idóneo para un cargo, al amparo del Artículo 4.006 de la Ley Electoral. 16 L.P.R.A. sec. 3156.

En dicha ocasión reiteramos que el derecho a ser candidato y a comparecer en la papeleta no son derechos fundamentales. McClintock v. Rivera Schatz, *supra*, pág. 21; P.A.C. v. E.L.A. I, *supra*; García v. Luciano, 115 D.P.R. 628, 630 (1984). No obstante, aclaramos que la ley tutela que el elector afiliado tenga el derecho estatutario a que se le considere para ser nominado por su partido como candidato a cualquier cargo electivo. 16 L.P.R.A. sec. 3156. En la siguiente oración del mencionado Art. 4.006, se establece que "[a] fin de garantizar este derecho, todo partido político tendrá que participar en primarias en aquellos casos en que surja más de un candidato idóneo, según lo establecido en este subtítulo y ninguna disposición reglamentaria del partido podrá violar ese derecho".[4] *Id*. Conforme al Artículo 4.014 de la Ley Electoral, constituye *candidato idóneo* un elector afiliado que figure en el registro de miembros afiliados al partido, que preste juramento en el que acepte ser postulado como

---

[4] Las reglas de hermenéutica nos conducen a concluir que la "consideración" que contempla la Ley Electoral en este artículo se refiere a la prerrogativa de todos los electores afiliados a nominar al candidato oficial para los comicios generales mediante el proceso de primarias o algún método alterno de selección, conforme a lo dispuesto por el Art. 4.006-A de la referida ley. 16 L.P.R.A. sec. 3156a. De hecho, en esa ocasión aclaramos que al asegurar que todo elector afiliado del partido tenga acceso al proceso de primarias, la Ley Electoral pretende proteger el derecho de todo elector a votar de forma efectiva, además que propende a un sistema electoral justo y honesto. McClintock v. Rivera Schatz, *supra*, pág. 24.

candidato y acatar el reglamento de su partido, y que cumpla tanto con los requisitos constitucionales aplicables al cargo como con los otros requisitos formales.[5] Véase 16 L.P.R.A. sec. 3164.

Por otro lado, el artículo 2.001 de la Ley Electoral también garantiza **"[e]l derecho de todo elector afiliado a disentir respecto de las cuestiones de su respectiva colectividad política que no sean de naturaleza programática o reglamentaria"**. (Énfasis suplido) 16 L.P.R.A. sec. 3051 (6). No obstante, en armonía con la libertad de asociación, la regulación estatutaria vigente permite exigir a los afiliados la aceptación y cumplimiento con los reglamentos y el programa de gobierno del partido político como requisito para la afiliación.

Sin cierta disciplina interna, basada en criterios razonables de ideología, es imposible que el partido aspire a la consecución de sus objetivos. F. Flores Giménez, La democracia interna de los partidos políticos, [sin ed.], Madrid, Publicaciones del Congreso de los Diputados, 1998, págs. 178-184. De hecho, la Ley Electoral faculta al

---

[5] Entre los otros requisitos formales para ser considerado como elector en Puerto Rico se encuentran: ser Ciudadano de los Estados Unidos o de Puerto Rico, estar domiciliado en la Isla, tener 18 años a la fecha de la elección, estar debidamente inscrito antes de ésta y no haber sido declarado judicialmente incapaz. 16 L.P.R.A. sec. 3053. Aparte de ser un elector calificado, la Ley Electoral establece otros principios esenciales de toda candidatura. Véase 16 L.P.R.A. Sec. 3151. Los partidos pueden "cualificar" la idoneidad de los candidatos siempre y cuando sus disposiciones reglamentarias para tales efectos no contravengan los derechos y prerrogativas que surgen de la Ley Electoral, supra.

partido, en el ejercicio de su derecho a la asociación, a establecer los límites programáticos y reglamentarios que estime convenientes y, en consecuencia, tiene la potestad de conocer cada solicitud de afiliación y calificación para decidir al respecto de acuerdo a la idoneidad del aspirante. Véase 16 L.P.R.A. secs. 3157, 3167. Por ello, hemos reconocido que los partidos están facultados para identificar a las personas que deseen formar parte de su membresía, así como deben tener potestad de disciplinar, descalificar y expulsar a quienes se aparten de sus criterios fundamentales de asociación, siempre y cuando se cumpla con el debido proceso de ley. McClintock Hernández v. Rivera Schatz, *supra*, pág. 18.

Ahora bien, el derecho a disentir que provee la Ley Electoral, *supra*, sobre asuntos no programáticos ni reglamentarios no puede ser vaciado de contenido ante los poderes asociativos de la agrupación política. El pluralismo y el derecho al voto, como valores superiores del ordenamiento jurídico, deben integrarse en el concepto de democracia interna de los partidos políticos.

De hecho, nuestra Ley Electoral está cimentada en dichos principios que le conceden una clara primacía a las primarias como el mecanismo más adecuado para dirimir conflictos intra-partidistas de carácter político. Es por ello que "la organización interna y el funcionamiento de las asociaciones deben ser democráticos, con pleno respeto al pluralismo." D. Bautista Plaza, La función

constitucional de los partidos políticos, 1era edición, Granada, Editorial Comares, S.L., 2006, pág. 88. De esta manera, nuestro ordenamiento electoral dispone unas salvaguardas para evitar la partidocracia.[6]

En ese sentido, y de modo ilustrativo, precisa señalar que el Tribunal Supremo Federal ha esbozado que **"contending forces within the party employ the primary campaign and the primary election to finally settle their differences […] A primary is not hostile to intraparty feuds; rather it is an ideal forum in which to resolve them"**. Eu. v. San Francisco County Democratic Central Committee, *supra*; Storer v. Brown 415 U.S. 724 (1974); American Party of Texas v. White, 415 U.S. 767 (1974).[7] De hecho, se ha sostenido que los estados

---

[6] Véase, a modo comparativo, la Constitución española y su disposición relativa a los partidos políticos. Constitución española de 1978, Art. 6. Véase además, el Art. 21 de la Constitución alemana. Grundegesetz [GG] [Constitución], art. 21, 1949 (Ley Fundamental de Bonn).

[7] La controversia de autos se distingue analíticamente de los otros casos federales invocados por el PNP, donde el valor examinado siempre es el derecho de los no afiliados a participar en los procesos internos de la agrupación política. Véase, a modo ilustrativo, Tashjian v. Republican Party of Connecticut, 479 U.S. 208 (1986); Democratic Party of U.S. v. Wisconsin v. ex rel. LaFollete, 450 U.S. 107 (1981); Rosario v. Rockefeller, 410 U.S. 752 (1973); Cousins v. Wigoda, 419 U.S. 477 (1975). Véase además, D. Hays Lowenstein, Associational rights of major political parties: A skeptical inquiry, A 71 Tex. L. Rev. 1741 (1993); Note, Primary elections and the collective right of freedom of association, 94 Yale L.J. 117 (1984).

Los únicos casos que cita el PNP con hechos relativamente similares a la acción de descalificación bajo nuestro escrutinio se distinguen claramente del caso de autos, pues ninguno involucraba a electores previamente afiliados y mucho menos electos por el mismo partido. LaRouche v. Fowler, 152 F.,3d. 974 (D.C. Cir. 1998); Duke v. Messey, 87 3d 1266 (11th Cir. 1996); Belluso v.

no pueden promulgar leyes electorales para mitigar el sectarismo y la disidencia interna en los partidos, dado a que reconoce que el proceso de las primarias es el mecanismo adecuado para resolver las diferencias políticas entre los electores afiliados a un partido y para identificar los candidatos que representarán al mismo en las elecciones generales. Véase, a modo ilustrativo, Eu. V. San Francisco County Democratic Central Committee, *supra*; Ripon Society, Inc. v. National Republican Party, 173 U.S. App .D.C. 350, 384, 525 F.2d 567, 601 (1975), cert. denied, 424 U.S. 933 (1976). Véase además, R. H. Pildes, Foreword: The Constitutionalization of Democratic Politics, 118 Harv. L. Rev. 28 (2004).

Para denegar una solicitud de afiliación o calificación de un aspirante a primarias que ha cumplido con los requisitos formales antes discutidos, el órgano rector del partido debe adoptar como criterio, por tanto, la existencia de manifestaciones o conductas procedentes del solicitante que muestren intenciones incompatibles con el programa y el reglamento de la agrupación política. Sin embargo, si la motivación de tal sanción se enfrenta directamente a la Constitución o a la Ley Electoral, *supra*,

---

Povthress, 485 F. Supp. 904 (D. Ga. 1960). En todos estos casos, los tribunales federales validaron la actuación del partido a base de que los solicitantes eran personas desafiliadas con principios ideológicos adversos a la colectividad, por lo cual su inclusión podría distorsionar las decisiones colectivas y las funciones esenciales de la agrupación política. Además, el reclamo de asociarse con quien no desee hacerlo no es un derecho cobijado por la Primera Enmienda de la Constitución Federal.

por arbitraria o desproporcionada, podría dar pie **en situaciones excepcionales** a la intervención judicial para garantizar los derechos democráticos establecidos en la referida ley. Véase 16 L.P.R.A. sec. 3051.

En otras palabras, más allá del programa y de los reglamentos del partido, tanto la Asamblea Legislativa, como la Comisión Estatal de Elecciones y las agrupaciones políticas pueden imponer un catálogo de requisitos formales secundarios para los aspirantes a primarias.[8] Lo que los reglamentos de un partido político no pueden disponer son requisitos que desprecien el principio constitucional de no discriminación o de igual protección, como los que tengan por fundamento la raza o género, o que quebranten el principio democrático que permea todo el esquema estatutario relacionado al proceso electoral. Por tanto, **los partidos no pueden imponer requisitos que vulneren el derecho al voto de los afiliados a la organización política, excluyendo de las papeletas a primarias las opciones que reflejan las corrientes políticas contemporáneas del elector de ese partido.**

De así hacerlo, se activa la autoridad de los tribunales para intervenir en tales disputas entre los

---

[8] Entre estos requisitos formales para dirimir la idoneidad de los aspirantes a primarias, se encuentran la radicación de endosos, la certificación del Departamento de Hacienda de que ha rendido planillas de contribución de ingresos en los últimos diez (10) años, y no haber sido convicto de ciertos delitos. Véase, por ejemplo, Reglamento de la Comisión Estatal de Elecciones Para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos, de 25 de mayo de 2007.

electores afiliados frente a su partido. <u>McClintock v. Rivera Schatz</u>, *supra*, pág. 16.[9] De hecho, la propia Ley Electoral, *supra*, le confiere jurisdicción a los tribunales en los procedimientos de descalificación de candidatos a primarias. Véase 16 L.P.R.A. sec. 3157. El propio PNP así lo reconoció cuando acudió ante el Tribunal de Primera Instancia para solicitar que dicho foro descalificara judicialmente a los Senadores e impidiera que sus nombres se incluyesen en la papeleta primarista.

Partiendo de este marco normativo, resolvemos la controversia ante nuestra consideración.

**III**

**A**

En el caso de autos, los Senadores invocan su derecho a disentir al amparo del Artículo 2.001 (6) de la Ley Electoral, *supra*, ya que el asunto de la Presidencia del Senado no era de naturaleza programática ni reglamentaria al momento de los hechos. Además sostienen que no pueden ser descalificados de la papeleta primarista por incumplir

---

[9] A tales efectos, el profesor Richard Pildes expresa lo siguiente:

> [C]onstitutional law must play a role in constraining partisan or incumbent self-entrenchment that inappropriately manipulates the ground rules of democracy. That functional justification for judicial review will be present in all constitutional democracies. External institutions, including courts, are needed to ensure that the background conditions that sustain democracy, particularly the absence of artificial barriers to robust partisan political competition, remain properly structured. R. H. Pildes, <u>Foreword: The Constitutionalization of Democratic Politics</u>, *supra*, pág. 154.

con los mandatos de la Asamblea General y del *Caucus* del PNP en el Senado, dado que tales directrices carecían de fuerza legal y reglamentaria. Aducen que al no estar vacante la Presidencia del Senado de Puerto Rico, no había que seleccionar a un nuevo Presidente. Además, arguyen que el Presidente del Senado de Puerto Rico es elegido por los miembros de ese cuerpo y no por los organismos rectores de un partido.

El Reglamento del Senado de Puerto Rico –aprobado a principios del cuatrienio mediante votación unánime– dispone que el Presidente de dicha cámara "será el jefe ejecutivo del Cuerpo en todos los asuntos legislativos y administrativos **durante todo el cuatrienio para el cual fue electo**" (énfasis suplido). Sección 6.1 (a), Reglamento del Senado, R. del S. 11, 10 de enero de 2005. A su vez, define al Presidente en propiedad como aquel miembro oficialmente electo por el Cuerpo para asumir el cargo, y especifica que se elegirá por la mayoría de los miembros que componen el Cuerpo mediante votación secreta en la Sesión Inaugural. Sec. 5.3 (h) y 6.2 (a), Reglamento del Senado, *supra*. **El propio reglamento no provee para la sustitución de dicho funcionario excepto como consecuencia de su renuncia, remoción o muerte**. Sec. 5.2, Reglamento del Senado, *supra.*

Por otro lado, el Artículo 45 del Reglamento del PNP dispone que el *Caucus* de cada cámara legislativa estará compuesto por los legisladores electos del Partido que mantengan los niveles de disciplina institucional conforme

a la Declaración de Propósitos y lealtad al Programa de Gobierno, a los reglamentos, acuerdos, resoluciones y decisiones del partido. Además, el referido artículo establece que

> "…[l]os acuerdos del *Caucus* […] obligarán a todos los legisladores del Partido, independientemente de su posición personal en el seno del *Caucus* o de la Conferencia Legislativa, según sea el caso, **excepto, cuando los mismos sean contrarios a las disposiciones de este Reglamento, al Programa de Gobierno, <u>a la Ley, la moral o el orden público</u>**. El *Caucus* de cada Cámara, así como el Directorio, podrá tomar la acción disciplinaria que considere adecuada contra cualquier legislador que viole los acuerdos del *Caucus* o de la Conferencia Legislativa." (Énfasis suplido). Art. 45, Reglamento del Partido Nuevo Progresista de 14 de agosto de 2005. [10]

En atención a lo anterior, la delegación del PNP en el Senado celebró un *Caucus* el 7 de enero de 2005, en el cual acordaron elegir al Senador McClintock Hernández al puesto de Presidente del Senado. Posteriormente, durante la Sesión Inaugural celebrada el 10 de enero de 2005, el Senador McClintock Hernández fue formalmente electo por los miembros de esta cámara legislativa a fungir como Presidente del Senado. Cinco meses después, el *Caucus* de dicho partido y la Asamblea General del PNP "ordenaron" a los Senadores a sustituir a McClintock Hernández por el Dr. Rosselló González en la Presidencia del Senado.

---

[10] A su vez, el Art. 8 del Reglamento del PNP, *supra*, dispone la obligación de todo miembro del Partido de acatar y cumplir con las resoluciones y acuerdos aprobados por la Asamblea General.

Conforme a las disposiciones reglamentarias del Senado, una vez se elige el Presidente del Senado por los miembros del cuerpo legislativo, el asunto deja de ser uno interno de la delegación del partido de mayoría y no se rige por los reglamentos aplicables al *Caucus* de dicha delegación. Desde ese momento, la Presidencia del Senado rebasa las consideraciones partidistas para responder exclusivamente al cuerpo legislativo completo, por lo que se rige por las disposiciones de la Constitución del Estado Libre Asociado, las leyes y los reglamentos establecidos en referencia a esta rama de gobierno. Claramente, una vez el Senado elige su Presidente, la remoción de dicho funcionario es un asunto interno del Cuerpo que no puede servir de justificación para descalificar a un elector afiliado que desea ejercer su derecho a participar en una primaria.

Por tanto, el mandato de la Asamblea General del PNP y la determinación posterior del *Caucus* para que se sustituyera al Senador McClintock Hernández por el Dr. Rosselló González en la Presidencia del Senado son incompatibles con el Reglamento del Senado de Puerto Rico y el ordenamiento constitucional que rige la Rama Legislativa. Indudablemente, los partidos no se pueden inmiscuir directamente en los asuntos constitucionalmente delegados a una rama del sistema republicano de gobierno. Es por ello que el PNP no podía interferir directamente en

la decisión sobre si procedía remover al Presidente del Senado.

Dicho de otro modo, el asunto de la Presidencia del Senado no responde a principios programáticos ni reglamentarios, sobre todo si tomamos en cuenta que en la etapa que nos concierne dicho asunto es injerencia del Senado en Pleno y no de los partidos. A su vez, ni el programa de gobierno del PNP ni sus reglamentos contemplan el asunto del liderato legislativo. Aunque la Asamblea General y el *Caucus* de la colectividad en el Senado impartieron unas instrucciones políticas, tales mandatos no eran legalmente vinculantes y, por tanto, no pueden servir de base para una sanción que atente contra el derecho al voto de los electores afiliados a la colectividad. Siendo así, es meritorio concluir que los Senadores disintieron sobre un asunto que no es de naturaleza programática ni reglamentaria.

Por ende, una sanción impuesta por los organismos directivos del Partido por no obedecer una instrucción de ese calibre sería una decisión contraria al ordenamiento electoral puertorriqueño. Ciertamente, no estamos ante una situación en donde los electores afiliados profesan ideales políticos incompatibles con los fines programáticos del PNP. De hecho, no se desprende del récord que los Senadores profesen lealtad a otro partido o marco político incongruente con los objetivos fundamentales del programa y del reglamento de la colectividad. Más bien, el caso de

autos versa sobre unas fuerzas intra-partidistas que compiten entre sí por posiciones de poder y cargos electivos en representación de la colectividad y del electorado que los eligió. El esquema electoral estatutario vislumbró el derecho a las primarias precisamente para los supuestos como el de autos, para que sea exclusivamente el universo de los electores afiliados al PNP los que decidan las consecuencias y el futuro político de todos sus candidatos.

Por tanto, **al ser aún electores afiliados al Partido, los Senadores peticionarios ostentan el derecho estatutario a exigir primarias, así como el derecho a disentir sobre asuntos no programáticos y no reglamentarios,** a menos que no cumplan con los requisitos formales descritos anteriormente. Ambas normativas responden al interés apremiante del Estado de salvaguardar el derecho al voto de los electores afiliados a que se incluyan en las papeletas las opciones que reflejan las corrientes políticas contemporáneas.

Los partidos no deben temerle a las primarias como instrumento para resolver este tipo de disputa política intra-partidista. Como indicamos en <u>McClintock Hernández v. Rivera Schatz</u>, *supra*, pág. 22-23, "los procesos primaristas deben entenderse como el mecanismo más apropiado para avanzar la democratización de la vida pública y hacer más transparente la toma de decisiones colectivas que habrán de afectar al país. Las primarias rompen con la disciplina

férrea que los partidos le imponen a sus militantes, fomentan la introducción de ideas nuevas en el foro público, adelantan el debate político, y aseguran una mayor igualdad del elector". **El proceso de las primarias – requerido por la Ley Electoral cuando surge más de un candidato idóneo y cuando no se viabilice algún método alterno de selección de candidatos según contempla la referida ley– es el modelo que mejor garantiza la participación directa de los electores afiliados en la designación de candidatos a cargos públicos y de los dirigentes del partido.[11] Por ende, las primarias son la máxima expresión democrática del derecho a la asociación y**

---

[11] En su análisis de los partidos políticos estadounidenses –los cuales fueron los primeros en utilizar el proceso primarista para elegir a sus candidatos– Jean Louis Seurin destaca que es en las primarias donde realmente se determina la condición de membresía del partido. Jean Louis Seurin, "La structure interne des partis politiques américains", Cahiers de la Fondation des Sciences Politiques, núm. 42, 1953, pág. 28. Véase además, R. H. Pildes, Foreword: The Constitutionalization of Democratic Politics, *supra*, pág. 102-103.

Por otro lado, el profesor Bruce Ackerman señala acertadamente que el surgimiento del sistema de primarias fue en gran medida responsable de la democratización de la política estadounidense:

> Over the course of the twentieth century, the rule of party leaders was increasingly checked and balanced by the decisions of primary voters. There are still states where party leaders huddle together in (smoke-free) rooms and wheel and deal over a slate of nominees. Yet these leaders are anxiously aware that their choices may be overturned by primary challengers who refuse to bow to their decisions. Bruce Ackerman, Voting with dollars: a new paradigm for campaign finance, Yale University Press, (2002), pág. 162.

**el vehículo procesal idóneo para reivindicar el derecho al voto.**[12]

Este requisito de celebración de primarias, que emana directamente del andamiaje estatutario electoral, constituye un objetivo meritorio, fundamental y apremiante cuando se canaliza por normas precisas y restrictas, como las que debidamente contemplan las mencionadas disposiciones de la Ley Electoral, *supra*.[13] A su vez, este interés está totalmente desconectado de la supresión de la expresión de la asociación política, y la celebración de

---

[12] Al sugerir la implantación de un sistema de primarias en Puerto Rico, el ex-gobernador Luis Muñoz Marín expresó que el esquema anterior no estaba a la altura de las exigencias democráticas de la época. Para tales efectos, el ex-gobernador expresó lo siguiente:

> Una buena legislación de primarias en Puerto Rico debe preservar la responsabilidad del Partido, y precaver contra la viciosa formación de grupos impropios del proceso democrático. En la elección se votan programas sostenidos por Partidos; en la primaria se votan hombres para honrar programas.

> Luis Muñoz Marín, "Mensaje a la segunda Asamblea Legislativa el 26 de febrero de 1953" a la pág 12; en R. W. Anderson, Gobierno y Partidos Políticos en Puerto Rico, Editorial Tecnos, Madrid, 1970, pág. 43.

[13] Véase, a modo ilustrativo, Rosario v. Rockefeller, *supra*. En dicho caso, el Tribunal Supremo Federal reconoció que el Estado tiene un interés apremiante en preservar la integridad del proceso electoral. Este foro también ha establecido que el Estado puede implantar restricciones que protejan la integridad electoral del proceso primarista. En American Party of Texas v. White, 415 U.S. 767 (1974), se validó un requisito para que los partidos principales nominen a sus candidatos mediante primarias, mientras que los partidos más pequeños seleccionen a los mismos en convenciones. Véase además, J. Hart Ely, Democracy and Distrust: A Theory of Judicial Review, Cambridge, Harvard University Press, 1980.

primarias representa, en efecto, el medio menos restrictivo para alcanzar el mismo.

Dado que la función que ostentan los partidos en el proceso electoral puertorriqueño está investida de poderes cuasi-gubernamentales, únicamente las agrupaciones políticas que satisfagan en su estructura los parámetros que contempla la Ley Electoral, *supra*, pueden brindar la garantía que la autoridad gubernamental se deriva del pueblo.[14] Así, pues, resulta evidente que el procedimiento de descalificación instado por el PNP contra los cuatro Senadores no cumple con las exigencias antes mencionadas.

**El presente caso no trata de una controversia entre un partido y electores no afiliados, sino sobre los parámetros mínimos de democracia interna que la Ley Electoral exige a las agrupaciones políticas para la selección de candidatos de cara a las elecciones generales. Al tratarse de miembros afiliados, el Estado puede requerir que el partido se rija por procedimientos democráticos y que el liderato responda directamente a una membresía informada.** Tal regulación estatal no infringe la libertad de asociación porque no se enfrenta a las determinaciones relacionadas al contenido del programa o del reglamento de la colectividad.

---

[14] Como ya indicamos, este requisito de democracia interna para los partidos se puede satisfacer tanto con el proceso de primarias que dispone el Art. 4.006 de la Ley Electoral, así como por alguno de los métodos alternos de selección de candidatos, según los contempla el Art. 4.007 de la referida ley. 16 L.P.R.A. secs. 3156, 3156a. Véase además, D. Grimm, Los partidos políticos, *supra,* pág. 411.

Lo expuesto anteriormente tampoco implica que un partido político no pueda ejercer su derecho constitucional a la libertad de expresión para impartir instrucciones políticas a sus miembros afiliados y endosar o hacer campaña en contra de las candidaturas y el liderato de su preferencia. Véase, a modo ilustrativo, Eu. V. San Francisco County Democratic Central Committee, 489 U.S. 214 (1989).

**B**

Por último, no somos tan ingenuos para ignorar que, en esencia, lo que hizo el Comité de Evaluación del PNP fue disciplinar nuevamente a los Senadores con los mismos cargos que dieron lugar a las sanciones que anulamos en McClintock v. Rivera Schatz, *supra*. De hecho, las imputaciones medulares incluidas en las dos querellas que sirvieron de base al proceso ante el Comité de Evaluación coinciden esencialmente con las que dieron lugar al proceso disciplinario que una vez anulamos. Asimismo, en las querellas presentadas ante dicho Comité se incluyeron como anejos las querellas anteriores y se incorporaron todas las alegaciones allí esbozadas.

Más aún, el Comité de Evaluación –al hacer el trasfondo del caso– hizo alusión únicamente al acuerdo alegadamente desacatado por los Senadores dirigido a escoger al Dr. Rosselló González como Presidente del Senado para sustituir al Senador McClintock Hernández. En síntesis, ese fue el único hecho sobre el cual el Comité de

Evaluación pasó juicio, el cual también fue lo que sirvió de fundamento para el proceso disciplinario. Al así hacerlo, el Comité de Evaluación se basó en las determinaciones anteriores que fueron invalidadas por este Foro para concluir que los Senadores peticionarios se "desafiliaron voluntariamente" del PNP.

Como ya mencionamos, los partidos pueden expulsar y sancionar a sus miembros, siempre y cuando las razones para ello no sean contrarias a la ley y se siga un procedimiento que provea las garantías del debido proceso de ley. A pesar de ello, el Comité de Evaluación cimentó su decisión de "no cualificar" a los Senadores en la llamada "desafiliación voluntaria", determinación que no es propia de un proceso ante dicho organismo. Nótese que el propio Reglamento del PNP le reserva al Directorio la facultad de disciplinar a los miembros afiliados que ocupan el cargo de legislador. Art. 98, Reglamento del PNP, *supra*. A su vez, el Reglamento delega en el Comité de Evaluación únicamente la tarea de "evaluar los méritos y requisitos de los aspirantes a cargos públicos por elección". Art. 53, Reglamento del PNP, *supra*.

Dado que la decisión de "no cualificar" se basó en determinaciones inherentes al proceso disciplinario que dejamos sin efecto, y toda vez que no se ha reiniciado trámite disciplinario alguno, entendemos que mediante el proceso ante el Comité de Evaluación el PNP diseñó un subterfugio para eludir el cumplimiento de nuestro

dictamen. En <u>McClintock v. Rivera Schatz</u>, *supra*, pág. 26, expresamente dispusimos que "el PNP no puede utilizar su facultad de disciplinar a sus electores afiliados como un subterfugio para coartar el derecho del miembro elector a solicitar primarias de su partido". Por ende, el foro de instancia erró al declarar Con Lugar la solicitud de descalificación de los Senadores.

Ahora bien, como mencionamos anteriormente, nuestra determinación no impide que ni el liderato del partido ni la propia colectividad expresen públicamente su posición institucional con respecto a las candidaturas de los peticionarios. Es mediante las primarias que las fuerzas que compiten entre sí dentro de un partido tienen la oportunidad de exponer su posición ante sus afiliados para que éstos, en última instancia, resuelvan dicha lucha política mediante su voto.

**IV**

En conclusión, como cuestión de derecho constitucional puertorriqueño la libertad de asociación no es un derecho absoluto, por lo que puede tener limitaciones. Nuestra Ley Electoral, *supra,* es la disposición legal que regula este asunto. Establece como limitaciones, entre otras, el derecho de los electores afiliados a un partido político a participar de primarias en las que compitan por representar a su partido y el derecho a disentir en asuntos no programáticos o no reglamentarios. Aunque un partido político tiene, como corolario de su derecho a la

asociación, la facultad de determinar quiénes pueden aspirar a ser nominados como candidatos a unas elecciones generales, dicha facultad no puede descansar en la absoluta discreción del organismo directivo central de la colectividad, ni en criterios irrazonables o arbitrarios.

En el presente caso hemos concluido que el Comité de Evaluación no tenía facultad para desafiliar a los Senadores Jorge de Castro Font, Migdalia Padilla Alvelo, Luz Arce Ferrer y Carlos Díaz Sánchez. Ninguno retó el programa de gobierno del PNP, según se desprende del propio expediente ante nuestra consideración. Siendo ello así, éstos permanecen como electores afiliados al PNP y, por ende, le asisten todos los derechos y prerrogativas que la Ley Electoral, *supra,* les garantiza. Dicha solicitud de descalificación fue un intento del PNP de eludir nuestra decisión en <u>McClintock v. Rivera Schatz,</u> *supra*, en la cual anulamos las sanciones impuestas por la colectividad en contra de los Senadores.

Por consiguiente, se declara Con Lugar la apelación y se revoca el dictamen recurrido. Se les ordena a Elías Sánchez, Secretario General del Partido Nuevo Progresista, y a Ramón Bauza, Comisionado Electoral de la colectividad, certificar a los Senadores como aspirantes en las primarias y radicar las certificaciones correspondientes ante la Comisión Estatal de Elecciones.

Se dispone además, que será nula cualquier actuación de parte de los recurridos dirigida a impedir o evitar que

los Senadores figuren en la papeleta de las primarias que se celebrarán el 9 de marzo de 2008. De así actuar, el Partido Nuevo Progresista se colocaría al margen de la ley.

Se dictará Sentencia correspondiente.


                                    Federico Hernández Denton
                                         Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Nuevo Progresista

    Recurrido

        v.

                            CT-2007-7          Certificación

Jorge de Castro Font, Migdalia
Padilla Alvelo, Luz Z. Arce
Ferrer y Carlos Díaz Sánchez

    Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 27 de diciembre de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se declara Con Lugar la apelación y se revoca el dictamen recurrido. Se les ordena a Elías Sánchez, Secretario General del Partido Nuevo Progresista, y a Ramón Bauza, Comisionado Electoral de la colectividad, certificar a los Senadores como aspirantes en las primarias y radicar las certificaciones correspondientes ante la Comisión Estatal de Elecciones.

Se dispone además, que será nula cualquier actuación de parte de los recurridos dirigida a impedir o evitar que los Senadores figuren en la papeleta de las primarias que se celebrarán el 9 de marzo de 2008. De así actuar, el Partido Nuevo Progresista se colocaría al margen de la ley.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez disiente con opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Partido Nuevo Progresista

     Recurrido

       v.

Jorge De Castro Font, Migdalia       CT-2007-7
Padilla Alvelo, Luz Z. Arce
Ferrer y Carlos A. Díaz
Sánchez

     Peticionarios


Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.


San Juan, Puerto Rico, a 27 de diciembre de 2007.


Mediante el presente caso la Mayoría invade las facultades de gobierno propio que disfrutan los partidos políticos bajo el esquema democrático contenido en la Constitución de Puerto Rico. La Opinión mayoritaria interviene en forma impermisible con la amplia discreción de los partidos políticos para formular e interpretar su reglamentación interna y resolver sus disputas al

amparo de la misma. La Mayoría interviene en un asunto que exige restricción judicial, por no estar bajo el poder de los tribunales el decidir y determinar cual es el cuadro de aspirantes en una primaria interna de un partido político. En el día de hoy este Tribunal ha decidido que determinados senadores electos bajo la insignia del Partido Nuevo Progresista tienen el derecho a ser aspirantes en una primaria interna de ese partido político, cuando esa colectividad entiende que han violado su Declaración de Propósitos, sus reglamentos y los acuerdos y decisiones de sus organismos rectores, todo en violación a una declaración de fidelidad, prestada bajo juramento, donde se comprometieron a cumplir con los mismos para representar a ese partido político en el Senado de Puerto Rico. Por entender que los tribunales de Puerto Rico, por impedimento constitucional, no tienen facultad alguna para formular opinión o adjudicar tal asunto DISENTIMOS.

## I

El Hon. Jorge De Castro Font, en adelante Senador De Castro Font, la Hon. Migdalia Padilla Alvelo, en adelante Senadora Padilla Alvelo, la Hon. Luz Z. Arce Ferrer, en adelante Senadora Arce Ferrer y el Hon. Carlos A. Díaz Sánchez, en adelante Senador Díaz Sánchez, en conjunto los Senadores, fueron electos bajo la insignia del Partido Nuevo Progresista, en adelante P.N.P., en los

comicios electorales celebrados el 2 de noviembre de 2004.

Tal y como dispone el artículo 16 del Reglamento del P.N.P., se emitió una convocatoria, publicada en la prensa escrita invitando a todos sus miembros a asistir a la celebración de la Asamblea General el domingo 15 de mayo de 2005, a las 10:30 A.M. en el Coliseito Pedrín Zorilla.

El 15 mayo de 2005, la Asamblea General del P.N.P. aprobó una Resolución en la cual se le instruyó a los senadores del *Caucus* electos por ese partido a elegir al Honorable Pedro Rosselló González, en adelante Senador Rosselló González, Presidente del Senado de Puerto Rico, en adelante el Senado.

El 26 de mayo de 2005, el *Caucus* Senatorial del P.N.P. acordó, por una mayoría de los Senadores miembros de ese *Caucus*, acatar el mandato de la Resolución aprobada en la Asamblea General del 15 de mayo de 2006 y proceder a elegir al Senador Rosselló González a la posición de Presidente del Senado. Ninguno de los Senadores acató el mandato de dicha resolución.

El 7 de junio de 2005, se presentó una querella en contra del Senador De Castro Font ante el Directorio del P.N.P, en adelante el Directorio. El Directorio determinó declarar al Senador De Castro Font como persona *non grata* en el P.N.P., destituirlo de toda posición de liderato, suspenderlo de manera sumaria y permanente como miembro

de ese partido, prohibirle participar en los organismos del P.N.P. y recomendarle a la Asamblea General de ese partido político su expulsión.

El 8 de junio de 2005, el licenciado Rivera Schatz le informó, por escrito, al Senador De Castro Font, las determinaciones del Directorio antes descritas, y le informó que se le concedía un término de cinco (5) días para apelar tal decisión.

Oportunamente, el Senador De Castro Font apeló la determinación del Directorio. Alegó, entre otras cosas, que no se le proveyó oportunidad alguna de enfrentarse a la querella presentada en su contra antes de que el Directorio le impusiera las sanciones en su contra. Indicó, además, que tal organismo violentó su derecho a un debido proceso de ley y su derecho a la libertad de expresión.

El 1 de julio de 2005, se celebró una reunión del Directorio. En la misma, se declaró no ha lugar la apelación presentada por el Senador De Castro Font y se decidió mantener en pleno vigor las determinaciones tomadas el 7 de junio de 2005 en contra de éste.

En esa misma reunión, el licenciado Rivera Schatz presentó una querella en contra del Hon. Kenneth McClintock Hernández, Presidente del Senado, en adelante Senador McClintock Hernández, del Hon. Orlando Parga Figueroa, Vice-Presidente del Senado, en adelante Senador Parga Figueroa, y de los Senadores Arce Ferrer, Padilla

Alvelo y Díaz Sánchez.  Se les imputó: *"haber desafiado [a] los organismos rectores del partido, a saber, [l]a Asamblea General de Delegados, el Directorio y el propio Caucus del Partido en el Senado."*  Además, se indicó que los Senadores querellados no habían *"tenido deferencia o respeto alguno por el electorado que lo[s] eligió como senadores, discutiendo públicamente asuntos del Partido y distanciándose de las decisiones de la colectividad."* El Directorio acogió la querella.  Se determinó declararlos incursos en violaciones al Reglamento del P.N.P., relevarlos de toda posición de liderato en el partido, suspenderlos sumaria y permanentemente como miembros de los organismos del partido y prohibirles participar como candidatos bajo la insignia de esa colectividad política.

El 5 de julio de 2005, el licenciado Rivera Schatz le notificó al Senador De Castro Font que la recomendación del Directorio de expulsión del partido en su contra, sería atendida en la Asamblea General de Delegados del P.N.P. a ser celebrada el 14 de agosto de 2005.

El 5 de julio de 2005, el licenciado Rivera Schatz le notificó a los Senadores McClintock Hernández, Parga Figueroa, Arce Ferrer, Padilla Alvelo y Díaz Sánchez que tendrían cinco (5) días para apelar la decisión del Directorio.

El 8 de julio de 2005, los Senadores McClintock Hernández, Arce Ferrer, Padilla Alvelo, Parga Figueroa y Díaz Sánchez presentaron un alegato ante el Directorio

del P.N.P. Alegaron, entre otras cosas, que ellos no habían cometido las faltas imputadas y que el partido no podía imponerles sanciones bajo el palio del artículo 8 del Reglamento, puesto que ellos no eran oficiales de dicha colectividad política. Indicaron, además, que el organismo apropiado para dilucidar la querella presentada en su contra era el Comité de Conciliación del P.N.P. Adujeron, además, que al imponerles las sanciones apeladas se violentó su derecho a un debido proceso de ley.

El 10 de agosto de 2005, el licenciado Rivera Schatz les notificó a los Senadores De Castro Font, Padilla Alvelo, Díaz Sánchez, McClintock Hernández y Arce Ferrer que se les había concedido una vista evidenciaria en relación a las sanciones que fueron recomendadas en su contra y aprobadas por el Directorio del P.N.P. Dicha vista se celebraría el 14 de agosto de 2005, ante la Asamblea General.

El 14 de agosto de 2005, se celebró la Asamblea General de Delegados del P.N.P. Ninguno de los Senadores asistió a la misma. Dicha asamblea, expulsó de ese partido al Senador De Castro Font y reafirmó las sanciones impuestas en contra de los otros Senadores. Además, la Asamblea General adoptó un nuevo Reglamento para regir los procedimientos internos de esa colectividad política.

El 7 de marzo de 2006, el licenciado Rivera Schatz presentó ante el Directorio una nueva querella en contra

de los Senadores aquí peticionarios. Se alegó, entre otras cosas, que los Senadores habían mantenido una actitud de desafío a la Asamblea General y al Directorio del P.N.P., así como al *Caucus* de este partido político en el Senado. Se indicó, además, que los Senadores habían traicionado los postulados del P.N.P. A raíz de esto, se le solicitó al Directorio de esa colectividad política que se expulsara del partido a los Senadores McClintock Hernández y Parga Figueroa; y que se censurara a los Senadores Díaz Sánchez, Arce Ferrer y Padilla Alvelo.

El 8 de marzo de 2006, el licenciado Rivera Schatz le informó al Senador McClintock Hernández la determinación del Directorio de expulsarlo del P.N.P. Se le concedió un término de cinco (5) días para "*…solicitar audiencia ante la Asamblea para defenderse de las alegaciones y determinación en su contra.*"

El 13 de marzo de 2006, el Senador McClintock Hernández envió una carta al licenciado Rivera Schatz negando las violaciones que le fueron imputadas.

El 16 de marzo de 2006, el licenciado Rivera Schatz envió una carta al Senador McClintock Hernández indicando que su carta del 13 de marzo de 2006 sería acogida como una apelación para ser discutida en la Asamblea General del P.N.P.

El 21 de marzo de 2006, el Senador McClintock Hernández envió una carta al licenciado Rivera Schatz alegando que

la Asamblea General del P.N.P. no era el foro que estipulaba el Reglamento para considerar una apelación de un dictamen del Directorio.   Solicitó, además, que el asunto se viera en el Comité de Conciliación.  El licenciado Rivera Schatz rechazó esta última solicitud e indicó que la Asamblea General era el cuerpo con potestad para tramitar la apelación presentada por el Senador McClintock Hernández.

El 10 de agosto de 2006, el licenciado Rivera Schatz citó al Senador McClintock Hernández a comparecer a la Asamblea General del partido que se celebraría el 20 de agosto de 2006.   Se le indicó, además, que en dicha Asamblea se le permitiría argumentar y presentar prueba a su favor.

El 11 de agosto de 2006, el Senador McClintock Hernández le cursó una carta al licenciado Rivera Schatz informando que no asistiría a la Asamblea General a celebrarse el 20 de agosto de 2006.

El 20 de agosto de 2006, se celebró la Asamblea General del P.N.P.  Ninguno de los Senadores acudió a la misma. Dicha Asamblea discutió las sanciones recomendadas y las adoptó.

El 29 de marzo de 2007, el licenciado Rivera Schatz emitió una certificación de la decisión de la Asamblea General por virtud de la cual se expulsó del P.N.P. a los Senadores De Castro Font, McClintock Hernández y Parga Figueroa.   Se acreditó, además, que las Senadoras Arce

Ferrer y Padilla Alvelo y el Senador Díaz Sánchez no podrían figurar como candidatos bajo la insignia del partido, ni ocupar posiciones de liderato en esa colectividad política.

El 29 de marzo de 2007, los Senadores McClintock Hernández, De Castro Font, Arce Ferrer, Díaz Sánchez y Padilla Alvelo presentaron una petición de interdicto preliminar y permanente ante el Tribunal de Primera Instancia. Alegaron, entre otras cosas, que las sanciones impuestas eran nulas y contrarias a la Ley Electoral de Puerto Rico[15], en adelante Ley Electoral. Indicaron, además, que el P.N.P. había violentado las garantías que la Ley Electoral proveía a los electores afiliados a un partido.

El 10 de abril de 2007, el licenciado Rivera Schatz, en capacidad de Comisionado Electoral y Secretario General del P.N.P. presentó una *Moción de Desestimación y/o Sentencia Sumaria*. Alegó, entre otras cosas, que el recurso de injunction no era el adecuado para revisar la decisión disciplinaria tomada por un partido político. Argumentó, además, que los Senadores no probaron que sufrieran un daño irreparable de no concederse el remedio de interdicto y que estaban impedidos de solicitar dicho remedio por haber incurrido en incuria y falta de diligencia.

---

[15] 16 L.P.R.A. sec. 3001.

El 12 de abril de 2007, el Tribunal de Primera Instancia declaró no ha lugar la *Moción de Desestimación y/o Sentencia Sumaria*, por entender que los asuntos considerados en el caso de autos eran justiciables.

El 8 de mayo de 2007, el Tribunal de Primera Instancia dictó sentencia sumaria en la que declaró con lugar la demanda y concedió el remedio de interdicto solicitado por los Senadores. En su sentencia, el foro primario determinó que el P.N.P. violó las disposiciones de su Reglamento sobre el procedimiento a seguir al imponer sanciones disciplinarias a sus miembros. Sostuvo, además, que la decisión de la Asamblea General ordenando a los Senadores del *caucus* del P.N.P. a elegir como Presidente del Senado al Hon. Pedro Rosselló González, no era una cuestión programática o reglamentaria. Concluyó, además, que las sanciones impuestas a los Senadores eran nulas por contravenir la Ley Electoral y que no se les podía prohibir solicitar participar en las primarias del P.N.P.

Inconforme, el 17 de mayo de 2007, el licenciado Rivera Schatz presentó un escrito de apelación ante el Tribunal de Apelaciones y a la misma vez, una solicitud de certificación ante nos.

El 22 de mayo de 2007, expedimos el auto de certificación y le concedimos a las partes un término simultáneo para presentar sus respectivos alegatos.

El 12 de junio de 2007 emitimos Opinión, *McClintock Hernández v. Rivera Schatz*, 2007 T.S.P.R. 121. Este Tribunal declaró nulas las sanciones impuestas por el P.N.P. a los Senadores McClintock Hernández, De Castro Font y Díaz Sánchez, así como las impuestas a las Senadoras Arce Ferrer y Padilla Alvelo. Durante el mes de junio de 2007, los Senadores presentaron ante el P.N.P. sus intenciones de candidaturas.

El 19 de junio del 2007, el licenciado Leo Díaz Urbina, la Hon. Lourdes Ramos Rivera, Representante a la Camára, en adelante Representante Ramos Rivera y el Hon. Carlos Pagán González, Senador, en adelante Senador Pagán González, presentaron una querella contra la Senadora Padilla Alvelo y el Senador De Castro Font ante el Comité de Evaluación de Aspirantes a Cargos Públicos del P.N.P., en adelante el Comité. En ella se imputaron los 48 cargos siguientes:

1. Desacataron la Resolución de la Asamblea General y los acuerdos del Directorio y del caucus del P.N.P. en crasa violación a los Artículos 3,5,8,45 y 78 del Reglamento del P.N.P. e igualmente violaron su juramento en la Declaración de Fidelidad y Declaración Jurada de Candidatos del P.N.P.

2. Mediante la utilización de artimañas parlamentarias y reglamentarias, y en unión a los miembros de la minoría del PPD, despojaron de la portavocía del Senado a uno de los miembros de la mayoría senatorial compuesta por los once (11) Senadores del PNP que acataron los mandatos del caucus y de la Asamblea General.

3. Tan reciente como el 18 de junio de 2007, se unieron y confabularon con la delegación del PPD y en contra de los mandatos claros y precisos, tanto

de la conferencia legislativa como del caucus del Senado del PNP, aprobaron el Proyecto del Senado 2112 (incentivos industriales).

4. Despojaron, caprichosa y arbitrariamente, de la Presidencia de las Comisiones Senatoriales a aquellos Senadores del PNP que acataron las decisiones del caucus y de la Asamblea General.

5. Realizaron cambios de forma arbitraria en la composición de las Comisiones Senatoriales.

6. Enmendaron el Reglamento del Senado en unión a la minoría del partido de oposición para impedir la consideración de una moción para cambios en la Presidencia del Senado.

7. Incurrieron en faltas continuas de respeto y atropellos en contra de la delegación mayoritaria del PNP, a sus portavoces, y al Presidente del PNP, incluyendo la aplicación de la mordaza de la 'previa' a este último.

8. Limitaron continuamente la expresión de los miembros de la delegación del PNP en el hemiciclo del Senado (turnos especiales y debates).

9. En alianza con el partido de oposición –Partido Popular Democrático–impidieron la creación de la Comisión de Status, prioridad ideológica del PNP.

10. Imposibilitaron continuamente el acceso a los asesores de la delegación del PNP en el hemiciclo, limitando el trabajo legislativo de la delegación del PNP.

11. Cancelaron, caprichosa y arbitrariamente, contratos de asesores de la delegación del PNP.

12. Las constantes alianzas y conspiraciones con los miembros del partido de minoría (PPD) y en perjuicio del trabajo legislativo del PNP, se realizaban para evitar el posible disgusto de los legisladores del PPD, con el fin de evitar que les retiraran el respaldo que los han mantenido en las posiciones de liderato y de privilegio personal en el Senado.

13. No daban paso a investigaciones contra las administraciones pasadas del PPD.

14. No daban paso a proyectos de la delegación del PNP y presentaban proyectos sustitutivos para así adjudicarse la autoría de los mismos.

15. No daban trato igual a los portavoces de la mayoría del PNP en comparación con los de la minoría del PPD.

16. Restaban derechos y facultades a los portavoces del PNP. Ejemplo de ello, es que a diferencia de los portavoces de las minorías, los portavoces del PNP no podían solicitar la división de cuerpo para la corroboración de las votaciones.

17. No aprobaban mociones para obtener grabaciones de sesiones cuando estas eran solicitadas por los Senadores del PNP, sin embargo sí las aprobaban (sic) para los senadores de otros partidos.

18. Impedían que la imprenta del Senado imprimiera boletines informativos para los constituyentes de los Senadores del PNP, pero daban visto bueno para otros senadores. Ejemplo de esto es, el discrimen contra la oficina de la Senadora Norma Burgos.

19. En la asignación de recursos y facilidades del Senado siempre se beneficiaba al grupo del actual Presidente y a los miembros de la minoría del PPD, discriminando en contra de los miembros de la delegación del PNP.

20. Ante notificaciones del Secretario de Justicia sobre alegados señalamientos a Senadores del PNP, los mismos eran referidos a la Comisión de Ética a diferencia de los miembros del grupo del Presidente McClintock o los miembros del PPD, los que protegían ordenando acciones administrativas vengativas en contra de los querellantes.

21. Notificaban tardíamente a la delegación del PNP sobre vistas oculares, reuniones ejecutivas y vistas públicas.

22. El Reglamento del Senado ha sido enmendado en cinco (5) ocasiones, a fin de afectar adversamente y obstaculizar a la delegación del PNP.

23. La composición de la Comisión de Ética ha sido trastocada para obtener control de la misma por decreto del Presidente.

24. Ha manipulado la confirmación de nominaciones que se pueden catalogar de impropias por parte del Gobernador Acevedo Vilá.

25. Se confabularon con la minoría del PPD para referir viciosa y frívolamente al Presidente de la Cámara Hon. José Aponte al Departamento de Justicia y al Fiscal Especial Independiente.

26. Impedían que la delegación del PNP tuviera portavoces en las comisiones senatoriales.

27. Alteraban el orden de los autores de ciertas medidas legislativas para afectar a los Senadores de la delegación del PNP.

28. Trastocaban legislación de política pública ambiental de la (sic) administración del PNP. Ejemplo de ellos es, la Ley de la Reserva Natural y Agrícola.

29. Utilizan el foro senatorial para atacar viciosamente a líderes del PNP.

30. No incluyen ni nombran Senadores del PNP en comités de conferencias y comisiones especiales.

31. En clara violación al Reglamento Senatorial declaraban sin lugar o establecían nuevas reglas según les convenga a su posición. Ello proveniente de la presidencia, principalmente ante nuestros planteamientos de orden o de privilegio, todo en clara violación al Reglamento del Senado.

32. Despidieron a empleados identificados con el PNP por participar en actividades institucionales de la colectividad en su tiempo libre. Algunos ejemplos de ellos son la Sra. Glorimary Jaime, Lic. Tony Alicea, Sra. Wanda Sánchez, Sra. Mayita Meléndez y el Sr. Orlando Ortiz.

33. No desautorizaron (sic) a la entonces Sra. Nélida Santiago, cuando ésta fotografió a los manifestantes claramente identificados con el PNP el día del mensaje del Gobernador Acevedo Vilá.

34. Autorizaron con fondos públicos el establecimiento de una oficina de distrito para un senador por acumulación. Este es el caso del senador por acumulación del PPD Antonio Fas Alzamora.

35. Solo permiten un asesor para toa la delegación del PNP en el hemiciclo y por el contrario a la delegación del PPD les permiten varios asesores.

36. Fabricaron un caso de supuesta agresión al Senador De Castro Font por parte de un escolta del Senador y ex-Gobernador Pedro Rosselló.

37. Consistentemente dan prioridad a los descargues de medidas legislativas a los componentes del grupo del Senador McClintock. Los de la delegación del PNP se detienen en la Comisión de Reglas y Calendarios.

38. El Sargento de Armas del Senado realizó un registro en pleno hemiciclo al ayudante de la portavoz Senadora Nolasco, por supuestamente éste tener un arma de fuego, lo que resultó totalmente falso.

39. Las asignaciones de donativos legislativos son desproporcionales y cargados para favorecer las instituciones ubicadas en los municipios de San Juan y de Bayamón, donde se ubican los Senadores Carlos Díaz y Migdalia Padilla, mientras que la Senadora Margarita Nolasco de la delegación del PNP que es Senadora por el Distrito de Guayama, distrito que es mayor en población, le asignan menos de $1 millón de dólares.

40. Se adjudican medidas del programa de gobierno incluyendo cambios de nombre en autoría.

41. Como respuesta a una denuncia de posibles violaciones al Código de Ética y comportamiento impropio por parte del Senador Carlos Díaz, el Senador McClintock respondió ordenando que se investigara un supuesto espionaje político, lo que ciertamente nunca probaron, luego de gastar miles de dólares en fondos públicos y desviar la atención de lo que en realidad se debió haber investigado.

42. Se unieron a la delegación del PPD para conceder inmunidad total a la Sra. Nélida Santiago, sin determinar la aportación a la investigación y de lo que podría conseguirse con otros testigos.

43. El Senador Parga reiteradamente ha planteado públicamente que supuestamente reconstruirá el movimiento estadista, creando un nuevo partido estadista y abandonando el PNP.

44. Limitan el acceso y la expresión a los militantes del PNP en las gradas del hemiciclo del Senado, distinto a manifestaciones de otras organizaciones que visitan el Capitolio.

45. Ordenan a la policía desalojar a los manifestantes y militantes estadistas y del PNP de las gradas del hemiciclo sin justificación alguna.

46. Con regularidad asumen posturas y votan a favor de las posiciones y solicitudes del Ejecutivo, particularmente del Gobernador Acevedo Vilá, en contra de las determinaciones acuerdo del caucus del PNP.

47. Despojaron de funciones a miembros del PNP de la Comisión de Seguridad Pública de forma arbitraria e injustificada. Ejemplo de esto fue la remoción de la Senadora Burgos de dicha comisión.

48. En claro contubernio con el PPD permitieron y aceptaron la imposición del impuesto de ventas (Sales Tax) más alto en contra de la posición institucional del PNP, todo ello en perjuicio de nuestra ciudadanía y a un costo de cientos de millones de dólares anuales en contra de los pobres, los trabajadores y la clase media. El Directorio del PNP había aprobado un "Sales Tax" de un cuatro (4) por ciento y no siete (7%) por ciento como el impuesto por el Gobernador Acevedo Vilá con la ayuda de los legisladores del Presidente McClintock.

El licenciado Rivera Schatz, en calidad de Secretario General y Comisionado Electoral del P.N.P., presentó ante el Comité, una querella en contra de las Senadoras Padilla Alvelo, Arce Ferrer, así como el Senador De Castro Font. En ella, se expuso lo siguiente:

En Asamblea General de Delegados celebradas los días 20 de agosto de 2006, en el Hotel Conquistador en la ciudad de Fajardo y el 20 de mayo de 2007, en el Coliseíto Pedrín Zorilla en la Ciudad Capital de Puerto Rico, se ratificaron, por unanimidad todas las sanciones impuestas a los aquí querellados. Ello bastaría para negarles aspirar bajo la insignia de nuestro glorioso partido. La traición vil y descarada de los querellados, la pública alegación de legisladores del PPD sobre los

acuerdos a los que llegaban con estos y el evidente comportamiento desleal hacia el partido justifican negarles el privilegio de aspirar bajo la insignia del Partido Nuevo Progresista.  No obstante, existen otras razones para rechazar su aspiración. Veamos.

PRIMERO: El artículo 98 del Reglamento del PNP del 2005, establece en su parte pertinente lo siguiente:

'…*Toda aquella persona que desacate una decisión de la Asamblea General no podrá figurar como candidato bajo la insignia del Partido, ni ocupar posiciones de liderato*…'

SEGUNDO: El incumplimiento del acuerdo del 15 de mayo de 2005, aprobado por la Asamblea General;

TERCERO: el incumplimiento del acuerdo del caucus PNP en el senado del 26 de mayo de 2005;

CUARTO: el incumplimiento de su obligación contractual con el partido a los fines de acatar y respetar los acuerdos de los organismos de la colectividad;

QUINTO: la expresión, clara, robusta y convincente de el organismo de mayor autoridad y representatividad de nuestro partido (Asamblea General de Delegados) a los fines de que en el ejercicio de nuestro derecho constitucional declaramos que no queremos asociarnos con los querellados, en ninguna candidatura, puesto directivo, campaña ni evento electoral.

Posteriormente el licenciado Rivera Schatz presentó una segunda querella solicitando se extendiera al querellado Senador Díaz Sánchez, lo planteado en la originalmente instada por él contra los demás Senadores.

El Comité celebró vistas por separado para cada uno de los Senadores.  El 9 de julio de 2007, el Comité emitió una *Resolución* determinando no calificar a los Senadores para participar como aspirantes en la primaria interna del P.N.P.  Sostuvo, entre otras cosas, lo siguiente:

Revisados los hechos, alegaciones y el expediente en los casos de los peticionarios-querellados Jorge De Castro Font, Carlos Díaz Sánchez, Migdalia Padilla Alvelo y Luz Z. Arce Ferrer, celebradas las vistas correspondientes, consideradas las querellas de impugnación presentadas, y escuchadas todas las partes, **este Comité de Evaluación**, **por unanimidad**, concluye lo siguiente:

1. La afiliación al Partido Nuevo Progresista es un <u>requisito indispensable</u> para que un elector cualificado pueda ser certificado por este Comité como aspirante primarista. Así lo exigen al Reglamento del Partido, el Reglamento de Primarias del Partido y hasta la Ley Electoral de Puerto Rico:

> **Ley Electoral**, **Artículo 4.014.– Aceptación de Candidato a Primarias**.–
> "Todo elector aspirante a una nominación para un cargo público electivo mediante el sistema de primarias <u>deberá figurar en el Registro de Electores Afiliados del partido que corresponda</u> y **<u>prestar juramento</u>** ante notario o funcionario capacitado para tomar juramentos, <u>de que acepta ser postulado como candidato, de que acatará el reglamento oficial de su partido</u>, y de que cumplirá con los requisitos constitucionales aplicables y con las disposiciones de esta ley." (Énfasis nuestro.)

> Por su parte, el Reglamento del Partido, vigente, aprobado por la Asamblea General en 14 de agosto de 2005, y cuya vigencia–no controvertida-se extenderá más allá de las elecciones generales de noviembre de 2008, delinea específicamente la obligación de sus miembros y afiliados:

> Artículo 5: "Obligación de Defender la Declaración de Propósitos y el programa de Gobierno del Partido – Todo miembro del Partido aceptará y defenderá la Declaración de Propósitos y el Programa de Gobierno del Partido. Podrá, sin embargo, presentar sus propuestas, recomendaciones o posiciones individuales dentro de los organismos correspondientes del Partido. No obstante, siempre deber[a] acatar y

defender la Declaración de Propósitos y el Programa de Gobierno vigente. **A esos fines, toda persona que aspire a una posición electiva bajo la insignia del Partido en una elección general**, o que aspire a un cargo en el Directorio del Partido o como Presidente de Comité Municipal o de Precinto, **al presentar su intención como aspirante deberá presentar una declaración de fidelidad en la que hace constar su lealtad a la Declaración de Propósitos y al Programa de Gobierno del Partido. La Declaración de Propósitos incluye la lealtad a los principios de disciplina y respeto a los reglamentos de la colectividad, sus acuerdos y resoluciones de conformidad con el Artículo 8.**" (Énfasis nuestro.)

El Artículo 8, en su parte pertinente dispone:

Artículo 8-"…Todo miembro del Directorio y de la Junta Estatal, incluyendo a los funcionarios que obtuvieron cargos electivos bajo el emblema del Partido, tienen pleno derecho a expresar con absoluta libertad sus opiniones o preferencias ente los organismos del Partido a los que pertenece. Pero una vez el asunto es discutido y resuelto; y habiéndose tomado una decisión democráticamente por votación mayoritaria del organismo concerniente, esta se convierte en la posición institucional del Partido, excepto si el organismo la reconsidera o un organismo de superior jerarquía adopta una distinta. …"

2. El récord y los hechos confirman, sin lugar a dudas que, a partir de enero del año 2005, por razones de sus intereses personales, los peticionarios- querellados incurrieron en conductas voluntariosas, temerarias y lesivas al Partido Nuevo Progresista.

3. Mientras a principios del año 2005 los senadores aquí peticionarios- querellados tenían el apoyo mayoritario del Caucus PNP del Senado para mantener sus posiciones de máximo liderato y privilegios en ese cuerpo

legislativo, argumentaban públicamente que ese organismo auxiliar del Partido, creado por el Artículo 45 de nuestro Reglamento, constituía la máxima autoridad para hacer esa determinación.

4. No obstante, cuanto los peticionarios-querellados perdieron el apoyo mayoritario del Caucus del PNP, procedieron a menoscabar el mandato electoral y democrático de las elecciones generales de 2004 que delegó la mayoría parlamentaria senatorial al Partido Nuevo Progresista, creando una alianza con senadores de otros partidos y despojando institucionalmente al PNP y a sus senadores de la mayoría legislativa que les había delegado el pueblo en las urnas.

5. Por sus propios actos, los senadores peticionarios-querellados quedaron desafiliados voluntariamente del Partido Nuevo Progresista al colocarse, no tan solo al márgen del Partido y su Reglamento, sino también en contraposición política, reglamentaria y programática en perjuicio del Partido y del pueblo de Puerto Rico, en violación de:

   a. sus juramentos de Fidelidad Institucional juramentados ante notarios y cuyo requisito para obtener una aspiración primarista también esta dispuesto y protegido en el Artículo 4.014 de la Ley Electoral; y

   b. en contraposición a las normas reglamentarias que delinean la conducta de un miembro afiliado a la colectividad, incluso cuando aspira y ocupa un cargo electivo (Artículo 5 y 8 del Reglamento PNP).

6. Cabe señalar que ningún senador o representante es electo por el pueblo para ocupar ninguna posición de liderato dentro de las cámaras legislativas. No hay derecho propietario individual alguno para las posiciones de liderato legislativo. Ninguna disposición constitucional, estatutaria ni reglamentaria dispone para garantizar posiciones de liderato legislativo a ningún senador o representante electo. Por el contrario, una vez son certificados los resultados electorales por la Comisión Estatal de Elecciones, se determina cual es el partido político que conforma la mayoría legislativa y cuales partidos se organizarán como delegaciones minoritarias.

Consumado lo anterior, son entonces los legisladores del Caucus del Partido de Mayoría los que determinan por votación quienes ocuparan las distintas posiciones de liderato dentro de cada cuerpo legislativo. Esa decisión es una de carácter rigurosamente político, pues responde a las visiones de estrategias políticas y programáticas del partido político y no a las de ninguno de sus miembros en particular. Incluso, a los caucus de los partidos de minoría se les reconoce la facultad de recomendar quienes de sus miembros deben ocupar determinadas posiciones dentro del pleno o de las comisiones legislativas. Es a los partidos políticos, constituidos como caucus o delegaciones, a quienes corresponde organizar los trabajos y las posiciones de liderato legislativo. En el caso de los senadores aquí peticionarios-querellados, es evidente que el Caucus del Partido Nuevo Progresista y sus organismos rectores con mayor representatividad determinaron, por votación y democráticamente que los intereses políticos, estratégicos, reglamentarios y programáticos del Partido estarían mejor servidos otorgando la presidencia del Senado al Presidente del Partido.

7. Con el propósito de mantener complacidos a los senadores y a los partidos de posición que mantienen su apoyo a sus posiciones de liderato senatorial y privilegios personales en el Senado de Puerto Rico, los peticionarios-querellados han promovido con sus votos la aprobación de legislación lesiva a nuestro pueblo y en contraposición del Partido Nuevo Progresista. Ejemplo evidente de lo anterior, constituye la manipulación del trámite legislativo senatorial que impuso una tasa contributiva abusiva sobre las ventas y usos, en contra de la pública y ferviente oposición institucional del partido.

8. Los antecedentes de los peticionarios-querellados le hacen concluir inequívocamente a este Comité que se trata de personas cuyos intereses individuales son los que determinan sus actos políticos, según las conveniencias personales de cada momento y cada circunstancia. Carecen de credibilidad, violentan sus propios juramentos de fidelidad, y ahora pretenden ir contra sus propios actos para obtener el beneficio de aspirar a una candidatura utilizando el emblema, los recursos y la base electoral del Partido, solamente cuando les conviene en su carácter personal e individual.

9. Definitivamente, no estamos frente a electores afiliados al Partido Nuevo Progresista. Nuestro más alto foro judicial, el Tribunal Supremo de los Estados Unidos de América, clara y diáfanamente ha reconocido que los partidos políticos tienen el derecho y la prerrogativa de determinar quienes son miembros afiliados de su colectividad. Véase Democratic party of the United States v. Wisconsin, 101 SCT 1010, 1019 (1981).

10. Este Comité concluye que los señores Jorge de Castro Font y Carlos Díaz Sánchez y las señoras Migdalia Padilla Alvelo y Luz Z. Arce Ferrer, son electores que una vez fueron afiliados a nuestro Partido, pero por sus propios actos y conducta contumaz, se desafiliaron voluntariamente "de facto" y "de jure", sustantiva y cualitativamente de este Partido. No deben figurar en el Registro de Afiliados al PNP que contempla nuestro Reglamento y que la Ley Electoral en su Articulo 3.028, protege como una facultad "exclusiva" y "potestativa" de los partidos políticos.

11. Estamos frente a electores que alegan ser estadistas y progresistas afiliados por conveniencia momentánea para adelantar sus aspiraciones personales de reelección frente a una nueva elección general. Electores que pretenden volver a utilizar el beneficio de ser elegidos bajo el emblema de un partido, pero que han demostrado que una vez ocupan el cargo, actúan como si hubieran sido electos como candidatos independientes, según les convenga unilateral y personalmente. Sin embargo, al momento de buscar la reelección, se niegan a utilizar el mecanismo de la "candidatura independiente" que se ajusta a sus conductas como electores porque ello les ocasiona mayores dificultades, gastos, esfuerzos y poca o ninguna posibilidad de ser elegidos.

12. Reglamentariamente, el Partido Nuevo Progresista no puede ni debe prestar su emblema para aspirantes o candidatos que actúan a conveniencia personal y hasta en perjuicio político, reglamentario y programático de la colectividad a la que juran lealtad y fidelidad institucional. Los peticionarios-querellados, como cualquier otro elector en su misma situación de conducta y antecedentes, no merecen la confianza del Partido ni ser considerados como sus

afiliados.  Por sus propios actos, realmente son adversarios del Partido Nuevo Progresista.

13.  Los peticionarios-querellados no cumplen con los requisitos de idoneidad ni con los valores, compromisos, lealtades y fidelidades institucionales del Partido Nuevo Progresista.

14. Aunque los senadores peticionarios-querellados lograran su elección en primarias y en elecciones generales, los mismos **no** podrían ser miembros del Caucus PNP en ningún cuerpo legislativo, pues esa membresía está fundamentada en la disciplina, la confianza y en la lealtad institucional hacia el Partido, su Reglamento, su Programa de Gobierno, los acuerdos y las directrices de sus organismos rectores. Obligar a un partido político a tener que incluir en sus cuadros de candidatos a personas que considera non gratas, que no los considera sus afiliados y que no cumplen cabalmente con los requisitos anteriores, sería un intento de manipular el proceso político para colocar al Partido Nuevo Progresista en desventajas electorales frente a los demás partidos, tanto durante el proceso eleccionario como en su posterior desempeño en la función programática y gubernamental.

**Recomendaciones al Directorio**

Considerando plenamente los derechos electorales de los peticionarios-querellados; y también los derechos electorales de los ciudadanos organizados legítima y democráticamente en el Partido Nuevo Progresista, pues ambas partes están igualmente protegidas por nuestra Constitución estatal y federal y por nuestra Ley Electoral, determinamos lo siguiente:

1.  No cualificar la solicitud de los peticionarios-querellados para figurar como aspirantes en la papeleta primarista del Partido Nuevo Progresista en la Primaria Interna de 9 de marzo de 2008.

2.  Dejar claramente establecido que esta descalificación está fundamentada (sic) en los Artículos 4.007. – Procedimiento para Descalificación de Candidatos.–; 4.014.–Aceptación de Candidato a Primarias.–; y 3.028.–"Registro de Electores Afiliados" de  la Ley Electoral de Puerto Rico.

3. Determinar que la exclusión de los peticionarios del Registro de Afiliados del PNP responde a claras y evidentes violaciones a los Artículos 5,8 y 45 del Reglamento del Partido.

4. A que la solicitud de aspiración primarista que presentaron, incluyendo la renovación de sus formularios de afiliación y sus juramentos de fidelidad al Partido con miras a la primaria y la elección general de 2008, son equivalentes a las mismas que presentaron en el 2003, pero que incumplieron y perjuraron con sus actos; convirtiéndose en personas *non gratas* para el Partido.

5. Que el Partido no los considera ni los puede aceptar como sus afiliados con miras a los próximos eventos eleccionarios, pues ellos mismos incurrieron en la desafiliación voluntaria y resultante de sus evidentes actuaciones voluntariosas, perjuradas y prejuiciosas en contra del Partido, sus organismos y su electorado afiliado.

6. Que en el caso de negar haberse desafiliado voluntariamente por sus actos, el Partido y sus organismos le reiteren que, en efecto, no los considera miembros afiliados, que no son elegibles para formar parte de ningún organismo del Partido, incluyendo los *caucus* y la conferencia legislativa creados por el Artículo 45 de nuestro Reglamento, ni para figurar como sus candidatos en ningún proceso electoral.

7. Tomar cualquier acción ulterior que el Directorio considere pertinente.

8. Notificar a las partes afectadas.

Las recomendaciones del Comité fueron acogidas por el Directorio por votación mayoritaria.

El 23 de julio de 2007, el P.N.P. presentó en el Tribunal de Primera Instancia, Sala Superior de San Juan, una *Petición de Descalificación*. Alegó, en síntesis, que los Senadores De Castro Font, Díaz Sánchez, así como las Senadoras Padilla Alvelo y Arce Ferrer no cumplían con

las disposiciones de la Ley Electoral, *supra*, y el Reglamento del P.N.P. al haber incurrido en violaciones al mismo por no acatar los acuerdos de la Asamblea General y el *caucus* de la mayoría senatorial. Se indicó, además, que los Senadores no cumplían con los requisitos de idoneidad ni con los valores, compromisos, lealtades y fidelidades institucionales del P.N.P. Se solicitó que de conformidad con el Artículo 4.007 de la Ley Electoral, *supra*, se declarara con lugar la petición de descalificación en contra de los Senadores.

El 3 de agosto de 2007, los Senadores presentaron su *Contestación Jurada a Querella de Descalificación*. Alegaron, entra otras cosas, que las sentencias emitidas en *McClintock Hernández v. Rivera Schatz, supra*, constituyen cosa juzgada en cuanto a los hechos del caso en autos. Indicaron, además, que el P.N.P. violentó la Ley Electoral, *supra*, al desafiliarlos por disentir en asuntos no-programáticos y no reglamentarios y en violación al procedimiento dispuesto en el Reglamento de ese partido. Ese mismo día, los Senadores presentaron una *Moción para Que Se Dicte Sentencia por las Alegaciones al Amparo de la Regla 10.3 de Procedimiento Civil*.

El 9 de agosto de 2007, el Tribunal de Primera Instancia, declaró no ha lugar la *Moción para Que Se Dicte Sentencia por las Alegaciones al Amparo de la Regla 10.3 de Procedimiento Civil* presentada por los Senadores.

El 10 de agosto de 2007, los Senadores presentaron en este foro una *Solicitud de Certificación*, la cual fue declarada no ha lugar.

Después de celebrar varios días de vista evidenciaria, el 17 de septiembre de 2007, notificada a las partes el 19 de septiembre de 2007, el Tribunal de Primera Instancia dictó *Sentencia* declarando con lugar la *Petición de Descalificación* presentada por el P.N.P. Sostuvo, entre otras cosas, lo siguiente:

> Interpretados en conjunto los artículos precitados del Reglamento del P.N.P. del 2005, concluimos que entre los requisitos que debe reunir un elector afiliado para poder participar en las primarias del 2008 están: (1) disciplina, lealtad, compromiso y respeto hacia los reglamentos, resoluciones, acuerdos y compromisos programáticos adoptados por votación mayoritaria; (2) aceptar y defender la *Declaración de Propósitos* del Reglamento y el Programa de Gobierno del P.N.P.; y (3) acatar las decisiones de la Asamblea General.

> Consideradas las disposiciones reglamentarias aquí transcritas y la evidencia presentada en la vista en su fondo, resolvemos que la decisión del Directorio del P.N.P. en relación con la determinación de violación a las disposiciones reglamentarias del partido por falta de disciplina, lealtad y compromiso hacia la *Declaración de Propósitos* del Reglamento del 2005 y hacia la decisión de la Asamblea General no es una arbitraria, ni caprichosa. Por tanto, este tribunal no habrá de intervenir con la determinación de no calificación del P.N.P. basada en la interpretación de un reglamento interno para no violentar la Sec. 6, Art. II de la Constitución de Puerto Rico que reconoce como un derecho fundamental el derecho de asociación. La libertad de asociación incluye y protege la prerrogativa de los partidos políticos de seleccionar los candidatos que habrán de representarles y que divulgarán su plataforma, mensaje, ideología y programa.

***

En cuanto al planteamiento de los codemandados consistente en que el Comité no les garantizó un debido procedimiento de ley, surge de la evidencia lo contrario. Los cuatro codemandados fueron notificados con copia de las dos querellas; presentaron oposición por escrito a las querellas con evidencia documental; se celebró una vista; tuvieron representación legal; tuvieron la oportunidad para presentar evidencia y refutar las alegaciones de las querellas y al evidencia que se acompañó con las mismas; no se cuestionó la imparcialidad de la mayoría de los miembros del Comité; no hay evidencia de que la decisión del Directorio no está basada exclusivamente en el récord; no se cuestionó la imparcialidad de los miembros del Directorio, organismo que emitió la decisión de descalificación; y tienen derecho a solicitar reconsideración y apelar.

Plantearon los 4 codemandados que el mandato de la Asamblea General del PNP del 15 de mayo de 2006 que ordena a los legisladores del PNP elegir al Dr. Pedro Rosselló como Presidente del Senado no tiene que ser acatada por ser contraria a la ley, en particular a la Carta de Derechos del Elector, *supra*. No les asiste la razón.

En ambas cámaras de la Asamblea Legislativa de Puerto Rico existen dos realidades políticas: la pública o *de jure* y la político partidista. Son dos realidades las que aunque separadas, coexisten y se entrelazan. El Art. 21 del Código Político, 2 L.P.R.A. sec. 2 establece que los miembros del Senado, sin hacer referencia a la mayoría parlamentaria, elegirá en la primera sesión los oficiales del Senado. Como antes vimos la realidad es otra. Véase Reglamento del P.N.P. del 2005, Art. 45.

¿Es ilegal el mandato de la Asamblea General por no estar vacante la presidencia del Senado? La contestación, no.

Se trata de una decisión tomada por un organismo rector del P.N.P. dirigida a sus electores afiliados y no a los senadores. No hay ley en esta jurisdicción que prohíba a un partido político impartir instrucciones a los electores afiliados que ocupen cargos públicos sobre las acciones a tomar para cumplir sus

planes, acuerdos, compromisos y programas. Los partidos políticos no dejan de existir una vez pasada las elecciones. Después de una elección general estos organismos dan cohesión a la labor de los funcionarios electos para alcanzar sus compromisos programáticos.

También debemos resolver si está impedido el P.N.P. por la Carta de Derechos del Elector contenida en la Ley Electoral, Art. 2.001 en específico en su inciso (6), *supra*, de no calificar los codemandados por éstos tener derecho a disentir sobre asuntos que no sean programáticos o reglamentarios.

Habiendo este Tribunal establecido que nointervendrá con la conclusión del P.N.P. consistente en que los 4 codemandados no deben ser calificados por no cumplir con los requisitos reglamentarios de disciplina, lealtad, compromiso y fidelidad hacia el partido, determinamos que la parte demandante satisfizo el requerimiento de la Carta de Derechos del Elector, Art. 2.001 (6), *supra*, al tomar su decisión de no calificar a los 4 codemandados, quienes alegan ser disidentes, por no cumplir con los requisitos reglamentarios para aspirar a cargos públicos bajo su insignia.

Señalan los codemandados que no pueden ser sancionados por disentir a tenor con lo establecido en la Carta de Derechos del Elector contenido en el Art. 2.001, inciso 6, *supra*.

Sobre el derecho de los codemandados a disentir, el Comité expresó en su resolución, a la página 12, lo siguiente:

*El 'elector afiliado' tiene derecho a disentir, pero no a incumplir sus juramentos de fidelidad ni a imponerse caprichosa, desafiante y temerariamente, una vez los organismos rectores del partido ventilan (sic) un asunto y adoptan una posición institucional por votación mayoritaria. De hecho, esa es la normativa reglamentaria del Partido Nuevo Progresista.*

*Dar una interpretación absoluta al término 'disentir' como equivalente a 'imponerse', 'desafiar' y hasta*

*'incumplir' juramentos de fidelidad institucional sería contradictorio al reconocimiento que la misma Ley Electoral (Artículo 4.014) hace sobre la validez y la existencia de los reglamentos de los partidos políticos y los juramentos de fidelidad institucional que sus afiliados y candidatos deben hacer al colectivo.*

Identificado un grado de tensión de entre los intereses del partido en mantener disciplina, compromiso y fidelidad hacia su declaración de propósitos y el de los codemandados a disentir en relación con el mandato de la Asamblea General del 15 de mayo de 2005, el tribunal está llamado a considerar el valor principal tutelado por la Ley Electoral de proteger el derecho del ciudadano a expresarse mediante el voto. Véase Kenneth McClintock Hernández et als. v. Thomas Rivera Schatz et als, supra, pág. 20.

Si bien los 4 codemandados son electores afiliados al P.N.P., así mismo fueron electos a cargos públicos bajo la insignia de ese partido político y lo representan ante el pueblo.

Al suscribir los 4 codemandados la declaración de fidelidad al P.N.P. se obligaron a respetar su declaración de propósitos, reglamento y las decisiones de sus cuerpos rectores.

El derecho de los 4 codemandados a disentir con respecto con el interés del P.N.P. a elegir al doctor Pedro Rosselló como Presidente del Senado, una vez es discutido internamente y tomada una decisión por la Asamblea General, el organismo rector de mayor jerarquía, la cuestión original se transforma en un interés en mantener la disciplina y la unidad institucional. Por ello, concluimos que el interés de los 4 codemandados a disentir no puede tener un rango de mayor jerarquía que el del P.N.P. en mantener su integridad, disciplina y unidad, porque de lo contrario se plantaría por el tribunal una semilla de discordia en el seno del partido. El Art. 2.001 (6) de la Ley Electoral, *supra*, reconoce que los electores tienen derecho a disentir sobre cuestiones no reglamentarias. Eso no quiere decir que como el Reglamento del

P.N.P. de 2005 no establece que el doctor Pedro Rosselló debe ser elegido como Presidente del Senado, los 4 codemandados tienen derecho a disentir sobre esa cuestión por no ser una reglamentaria. Esa posición es una simplista. Entendemos que entre las cuestiones reglamentarias a las que se refiere el Art. 2.001 (6), *supra*, es al mandato de sus organismos rectores. Esta a nuestro entender es la interpretación que hace un balance adecuado entre los intereses de los electores y los del partido político. Una interpretación contraria, violentaría el derecho fundamental de los partidos a la libertad de asociación.

*** 

Por todo lo ante expuesto, el tribunal declara la demanda con lugar. Se le ordena a la Comisión Estatal de Elecciones acatar la decisión del P.N.P. de no calificar a Jorge de Castro Font, Luz Z. Arce Ferrer, Carlos Díaz Sánchez y Migdalia Padilla Alvelo.

Inconformes, el 1 de octubre de 2007, los Senadores presentaron un recurso de apelación ante el Tribunal de Apelaciones, Región Judicial de San Juan, dónde señalaron que el Tribunal de Primera Instancia había cometido los errores siguientes:

**A.   Erró el Tribunal de Primera Instancia al resolver que los partidos políticos tienen la facultad de decidir asuntos que la Constitución reservó para los miembros de los cuerpos legislativos.**

**B.   Erró el Tribunal de Primera Instancia al insinuar que la Ley Electoral tiene visos de inconstitucionalidad.**

**C.   Erró el Tribunal de Primera Instancia al resolver que el PNP le brindó el debido proceso de ley a los senadores recurrentes.**

**D.   Erró el Tribunal de Primera Instancia al no aplicar al caso de autos a tenor con la doctrina de cosa juzgada.**

**E.   Erró el Tribunal de Primera Instancia al no desestimar la demanda que incoó el PNP por**

1.    **No presentar prueba el PNP suficiente en derecho para descalificar a los senadores recurrentes.**

2.    **Al ignorar que toda actuación de los senadores recurrentes están protegidos por la inmunidad parlamentaria.**

**F. Erró el Tribunal de Primera Instancia al incumplir con las funciones que le asigna la Ley Electoral de adjudicar por sí misma la descalificación de aspirantes a puestos sujetos a elección.**

El 7 de octubre de 2007, los Senadores presentaron ante nos un recurso de certificación, el cual fue expedido el 8 de octubre de 2007.

II

A

*Cosa Juzgada*

Los Senadores levantaron la defensa de cosa juzgada y alegan que existe identidad de causa, ya que ambos casos versan sobre si el P.N.P. puede prohibirles participar en las primarias de ese partido, por no acatar el mandato de elegir al Senador Rosselló González Presidente del Senado.  No les asiste la razón. Veamos.

La doctrina de cosa juzgada tiene base estatutaria en el Artículo 1204 del Código Civil de Puerto Rico[16], el cual dispone lo siguiente:

> **Para que la presunción de cosa juzgada surta efecto en otro juicio, es necesario       que entre el caso resuelto por la sentencia y aquel en el cual sea invocada, concurra la <u>identidad más perfecta entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron</u>**.(Énfasis nuestro.)

---

[16] 31 L.P.R.A. sec. 3343.

La jurisprudencia interpretativa del Artículo 1204, *supra*, ha expresado que tanto la doctrina de cosa juzgada como su modalidad de impedimento colateral, tienen como propósito el proteger a los litigantes contra lo que representa defenderse o probar sus reclamaciones en repetidas ocasiones tratándose de la misma controversia. En esencia, busca promover la economía judicial y administrativa al evitar litigios innecesarios y evitar decisiones inconsistentes.[17]

Según expresa el profesor José María Manresa y Navarro en su obra *Comentarios al Código Civil Español*, el referido artículo, se limita a brindar las reglas para que la resolución de un caso, a través de un juicio, enerve la acción entablada en otro, por la santidad que merece la cosa juzgada, y el respeto de toda sentencia ejecutoria. Sin embargo, añade que, no regula los efectos jurídicos que el debate en un pleito y resolución que lo termine, hayan de producir en otro asunto igual o idéntico en que no se haya estimado aquella excepción, dadas las circunstancias de cada caso y relaciones jurídicas que puedan mediar entre los contendientes, y la causa u origen de las reclamaciones posteriores.[18] Así también, expresa, que no cabe referir la cosa juzgada a

[17] Pagán Hernández v. U.P.R., 107 D.P.R. 720 (1978); Pereira v. Hernández, 83 D.P.R. 160 (1961).

[18] J. M. Manresa, *Comentarios al Código Civil Español*, 6ta. ed. rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, pág. 283.

resoluciones que por cualquier motivo, no juzgaron, esto es, no decidieron nada sobre el punto controvertido en el pleito en que la excepción es invocada.[19]

Para que sea efectiva la presunción de cosa juzgada en un pleito ulterior, resulta indispensable que exista la más **perfecta identidad** tanto en el plano objetivo, de las **cosas** y las **causas**, como en el plano subjetivo, de las **personas litigantes** y la **calidad** en que lo fueron en el caso resuelto por la sentencia y aquel en que dicha defensa afirmativa sea invocada.[20] La más "perfecta identidad" entre los elementos subjetivos y objetivos de las sentencias en relación, exige un juicio comparativo entre la sentencia anterior y las pretensiones del posterior proceso, a los fines de determinar, si concurren o no las identidades por razón de las personas litigantes, del objeto litigioso, y de la causa de pedir.

La cosa responde básicamente al **objeto o materia** sobre la cual se ejercita la acción. En este sentido hemos expresado, que un criterio certero para determinar la identidad del objeto es, si un juez está expuesto a contradecir una decisión anterior afirmando un derecho

---

[19] *Íd*. pág. 288.

[20] Autoridad de Acueductos v. Reyes, 77 D.P.R. 10, 14–16 (1954); Silva v. Doe , 75 D.P.R. 209, 214 (1953); Vidal v. Monagas , 66 D.P.R. 622 (1946); Junta Insular de Elecciones v. Cortes , 63 D.P.R. 819 (1944); Lausell Marxuach v. Díaz de Yáñez, 103 D.P.R. 533 (1975); Pagán Hernández v. U.P.R, *supra*.

nacido o naciente, entonces podemos afirmar que existe identidad de objeto y cosa juzgada.[21]

En este sentido, el profesor Manresa, señala que, cuando se trata de **identidad de cosas**, el género y la identidad de título y de obligación en que se basa el litigio será la regla atendible. De este modo, *"negado el derecho a una cosa principal debe entenderse resuelto lo relativo a las cosas accesorias o subordinadas, pero no viceversa"*. Y añade, *"cuando se declaran derechos (verbigracia, usufructo, posesión, uso, etc.) puede una misma cosa ser objeto de diferentes litigios, salvo el caso de fundarse todos esos derechos en una misma causa ya resuelta, verbigracia o un mismo contrato declarado nulo."*

Por tanto, es de rigurosa observancia que ambos litigios versen sobre idéntico objeto para que se dé la cosa juzgada, pues, aún cuando correspondan al mismo asunto, pueden concurrir circunstancias o estados que induzcan a distinta conclusión en el orden jurídico.[22]

En lo referente a **la causa**, dicho término posee un sentido que no es de razón o motivo de un contrato o acto jurídico, significando el fundamento capital, el origen

---

[21] Lausell Marxuach v. Diaz de Yañez, *supra*. Citando a E. Jiménez Asenjo, *Sobre el Alcance Real de la Cosa Juzgada*, 184 Rev. Gen. de Leg. y Juris. 63, 73 nota 1 (1948).

[22] J. M. Manresa y Navarro, *op cit.*, pág. 299.

de las acciones o excepciones planteadas y resueltas.[23] En otras palabras, la causa equivale al **fundamento o razón de pedir.** La identidad de causas existe cuando los hechos y fundamentos de las peticiones son idénticos en lo que afecta a la cuestión planteada.[24]

Igual criterio es aplicable en cuanto a la **identidad** y **calidad** de personas. Se considera en la práctica cumplida cuando los litigantes o las personas del segundo pleito, ejercitan la misma acción que se ejercitó en el primero, invocan iguales fundamentos y apoyan su pretensión en los mismos títulos. Es decir, que una misma sea la relación jurídica que fue materia de resolución en ambos litigios, aunque sean físicamente distintas las personas que en ellos intervinieron.[25]

En este proceso evaluativo cabe puntualizar que, es la parte dispositiva de las sentencia la que puede producir cosa juzgada, no así los fundamentos.[26] Además, se precisa que la sentencia primera en que la excepción de cosa juzgada se apoye, haya resuelto sobre el fondo del asunto.[27] En Millán v. Caribe Motors[28], señalamos que la

---

[23] Lausell Marxuach v. Diáz de Yañez, *supra*, pág. 536. Véase, además, J. Manresa y Navarro, *op cit.,* pág. 308.

[24] A & P Gen. Contractors v. Asoc. Caná, 110 D.P.R. 753, 765 (1981).

[25] J. M. Manresa y Navarro, *op cit.,* pág.319.
[26] *Íd.,* pág. 295.

[27] *Íd.,* pág. 297.

[28] 83 D.P.R. 494, 507 (1961).

mejor prueba para determinar si una sentencia anterior es un impedimento para una acción subsiguiente es, inquirir si la misma evidencia es suficiente para sostener ambas acciones. Por el contrario, si para sostener las acciones se necesita evidencia distinta entonces se trata de causas de acción diferentes y la primera sentencia no es impedimento para litigar la otra causa de acción.[29]

Siendo de aplicación la doctrina de cosa juzgada, la sentencia dictada en un pleito anterior impide que se litigue en un pleito posterior, entre las mismas partes y sobre la misma causa de acción y cosas, las cuestiones ya litigadas y adjudicadas. Impide, además, litigar aquellas cuestiones que pudieron haber sido litigadas y adjudicadas con propiedad en la acción anterior y no se plantearon.

No obstante, conviene puntualizar que la aludida doctrina no debe ser aplicada de forma rígida ni automática.[30] En Pérez v. Bauzá[31], y en Millán v. Caribe Motors Corp., *supra*, expresamos que un tribunal no debe aplicar la doctrina de cosa juzgada en forma inflexible, si al así hacerlo se derrotan los fines de la justicia, especialmente, si se plantean consideraciones de interés

---

[29] Margarita Mercado Riera et al. v. Mario Mercado Riera y otros, 100 D.P.R. 940 (1972).

[30] Méndez v. Fundación, 2005 T.S.P.R. 101, 2005 J.T.S. 106, 165 D.P.R. ___.

[31] 83 D.P.R. 220 (1961).

público. De este modo dejamos claro que, la doctrina de *res judicata* no es absoluta y debe siempre considerarse conjuntamente con el saludable principio de que debe dispensarse justicia en cada caso. A esos efectos hemos resuelto lo siguiente:

> Según se ha expresado, la doctrina descansa en el principio básico de que debe propiciarse la terminación de litigios, **pero si la aplicación rigurosa de la misma derrotaría en la práctica un derecho permeado en alguna forma del interés público, los tribunales se inclinan hacia la solución que garantice cumplida justicia**, en lugar de favorecer en forma rígida una ficción de ley que obedece fundamentalmente a un principio de conveniencia y orden procesal. (Énfasis suplido.)[32]

Hemos reconocido además, como excepciones a la doctrina de cosa juzgada, las siguientes: una sentencia previa la cual es nula o que fue dictada basándose en un allanamiento de partes que es nulo;[33] una sentencia previa dictada sin jurisdicción; una sentencia del Tribunal de Primera Instancia cuya revisión se intentó pero que no se pudo lograr por razones ajenas a la voluntad del apelante, fraude o aquella que derrota los fines de la justicia; y los casos que están permeados de consideraciones de orden público.[34] La doctrina de cosa

---

[32] *Íd.* Citando a <u>Universal Const. Co. v. City of Fort Lauderdale</u>, 68 So. 2d 366 (Fla. 1953).

[33] <u>Vidal v. Monagas</u>, *supra.*

[34] <u>Riera v. Piza</u>, 85 D.P.R. 268, 274 (1962); <u>Suárez Fuentes v. Tribunal Superior</u>, 88 D.P.R. 136 (1963); <u>Feliciano Ruiz v. Alfonso Develop. Corp.</u>, 96 D.P.R. 108,

juzgada no debe aplicarse inflexiblemente, especialmente cuando al hacerlo se desvirtúan los fines de la justicia, produce resultados absurdos o cuando se plantean consideraciones de interés público.[35]

Concluimos que no existe identidad de causa entre el presente caso y McClintock Hernández v. Rivera Schatz, 2007 T.S.P.R. 121, Opinión de 12 de junio de 2007. McClintock Hernández v. Rivera Schatz, supra., versaba sobre las sanciones impuestas a los Senadores por no acatar el mandato de la Asamblea General del P.N.P., mucho antes que se abriera el proceso de presentación de intención de candidaturas al Senado de Puerto Rico para la primaria a celebrarse el 9 marzo de 2008. A esos efectos el Tribunal de Primera Instancia aclaró en ese caso que los tribunales en ningún momento resolvieron que los aquí peticionarios tuvieran el derecho absoluto de participar en las primarias del Partido Nuevo Progresista sin antes cumplir, como todo aspirante a primarias, con los procedimientos dispuestos en la Ley Electoral, supra, que incluye el proceso de descalificación de candidatos. El foro primario se pronunció expresamente que ese caso dilucidó el tema de la destitución y de las sanciones impuestas a los electores afiliados de un partido político. Puntualizó ese foro, que en el ejercicio de

_____

114 (1968); Pagán Hernández v. U.P.R., supra, pág. 736; Millán v. Caribe Motors Corp., supra, pág. 509.

[35] Meléndez v. García, 158 D.P.R. 62, 92 (2002).

esos derechos concedidos y reconocidos individualmente a los aquí peticionarios como afiliados al Partido Nuevo Progresista, era procedente que éstos se sometieran al proceso de calificación que establece ese partido político bajo la Ley Electoral, *supra*. El caso en autos versa sobre la decisión del Comité de Evaluación de no cualificar la intención de los Senadores para participar como aspirantes a candidaturas al Senado en las primarias del P.N.P. por no cumplir con los requisitos correspondientes.

La doctrina de cosa juzgada, impide, litigar aquellas cuestiones que pudieron haber sido litigadas y adjudicadas con propiedad en la acción anterior y no se plantearon. En el pleito anterior, era imposible dilucidar si los Senadores cumplían con los requisitos estatutarios y reglametarios para poder figurar como aspirantes en la papeleta primarista del P.N.P., ya que el periodo de radicación de intención de candidaturas se abrió el 1 junio de 2007. Era imposible dilucidar tal asunto antes de dicha fecha, y de lo actuado por el Comité de Evaluación del P.N.P. Esto, claramente distingue, un caso del otro, derrotando la teoría de identidad de causa. La causa de acción del primer pleito giraba sobre las sanciones impuestas por los cuerpos rectores del P.N.P., mientras que la causa de acción en este pleito sobre petición de descalificación gira sobre la decisión del Comité de Evaluación del P.N.P. de no

cualificar a los Senadores por éstos no cumplir con los requisitos estatutarios y reglamentarios para presentar su intención de aspirar a un escaño al Senado de Puerto Rico, bajo la insignia del P.N.P.

Existen varias excepciones a la aplicación de la doctrina de cosa juzgada. Entre éstas se encuentran aquellos casos que están permeados de consideraciones de orden público.[36] Dicha doctrina descansa en el principio básico de que debe propiciarse la terminación de litigios. No obstante, si la aplicación rigurosa de la misma derrota un derecho permeado de interés público, los tribunales deben inclinarse hacia la solución que garantice cumplida justicia, en lugar de favorecer en forma rígida una ficción de ley que obedece a un principio de conveniencia y orden procesal. La doctrina de cosa juzgada no es absoluta y debe considerarse junto al principio de que debe dispensarse justicia en cada caso. La misma no se debe aplicar, cuando existe el potencial de desvirtuar los fines de la justicia, producir resultados absurdos o **cuando se plantean consideraciones de interés público.**[37]

El interés público del que está revestido el presente caso es aquel que está representado por el orden público constituido por el conjunto de principios, valores y normas de sabio gobierno democrático, que es parte del

---

[36] Pagán Hernández v. U.P.R., *supra*, pág. 736.

[37] Meléndez v. García, *supra*.

estilo de vida del pueblo de Puerto Rico, y que actúa como instrumento jurídico progresivo de nuestro ordenamiento jurídico constitucional y estatutario. Realmente, el interés público dimanante de esos valores nos imprime el deber de garantizar el derecho a la libertad de asociación como instrumento de nuestra democracia constitucional. La libertad de asociarse para la promoción y el progreso común de principios e ideologías políticas, necesariamente presupone la libertad de identificar las personas que constituyen esa asociación, en la forma de un partido político. Presupone, además, la autoridad como elemento inseparable de esa libertad, para limitar la condición de elector afiliado de dicha organización y de regular los requisitos para participar en una primaria interna, para representar la promoción y el progreso de esos principios e ideologías políticas. De otra forma el mandato electoral a ser emitido por nuestro pueblo en los próximos comicios electorales a celebrarse en noviembre de 2008 podría ser frustrado. De escogerse mayoritariamente esos principios e ideales por la ciudadanía, en los próximos comicios generales, solo se traducen los mismos en la acción que el pueblo entiende como de su beneficio a través de los funcionarios electos bajo la insignia de ese partido político. De no escogerse mayoritariamente esos principios e ideales, los funcionarios electos como minoría parlamentaria que los

representan tienen una función importantísima en nuestro sistema democrático, de rango constitucional, que igualmente podría ser frustrada. Cualquier otra consideración cede ante la prominencia e importancia de este interés público, dentro de nuestro sistema democrático de gobierno.

B

*Debido Proceso de Ley*

Los Senadores alegan que el P.N.P. les violentó su derecho a un debido proceso de ley, ya que todo el procedimiento interno estaba amañado para producir un solo resultado, la descalificación de sus candidaturas. Alegan, además, que dicha colectividad política solamente creó una apariencia de que se cumplió con el debido proceso de ley. No les asiste la razón. Veamos.

El Artículo II, Sección 7 de la Constitución de Puerto Rico dispone lo siguiente:

Ninguna persona será privada de su libertad o propiedad sin el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.[38]

El debido proceso de ley se puede manifestar de forma sustantiva y procesal.[39] Bajo la manifestación sustantiva, los tribunales deben examinar la validez de una ley, a la luz de los preceptos constitucionales

[38]Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 280.

[39] Rivera Rodríguez & Co. v. Lee Stowell, 133 D.P.R. 881, 887 (1993).

pertinentes, con el propósito de proteger los derechos fundamentales de las personas. El Estado no puede afectar de manera irrazonable, arbitraria o caprichosa los intereses de propiedad o libertad de una persona.

El debido proceso de ley, en su modalidad procesal, le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo se haga a través de un procedimiento que sea justo y equitativo.[40] Dependiendo de las circunstancias específicas del caso, diversas situaciones pueden requerir diferentes tipos de procedimientos, siempre persistiendo el requisito general de que sea un proceso justo e imparcial.[41]

Después que se determina cual de las dos modalidades de debido proceso de ley aplica, se tiene entonces que determinar cuál es el procedimiento exigido.[42]

El debido proceso de ley no tiene un contenido fijo independiente de la situación particular. En lo que concierne a lo procesal, no es un molde riguroso que se da en el abstracto, pues su naturaleza es eminentemente circunstancial y pragmática, no dogmática. En Gilbert v. Homar, 520 U.S. 924, (1997), citando a Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 895 (1961) y

---

[40] *Íd.*, págs. 887-888; López Vives v. Policía de P.R., 118 D.P.R. 219 (1987).

[41] *Íd.*
[42] Rivera Rodríguez & Co. v. Lee Stowell, *supra.*

<u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972) el Tribunal

Supremo de los Estados Unidos expresó lo siguiente:

> It is by now well established 'that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circunstances.… Due process is flexible and calls for such procedural protections as the particular situation demands.

El debido proceso de ley requiere que solamente se haga

*"some kind of hearing"* antes que se le prive cualquier

derecho propietario significante a una persona.[43] Aunque

es idóneo que se ofrezca la vista antes de privar un

derecho    propietario, en   ciertas   y  determinadas

situaciones, es suficiente con celebrar la vista

después.[44]

El 19 de junio de 2007, el licenciado Díaz Urbina, la

Representante Ramos Rivera y el Senador Pagán González

presentaron una querella ante el Comité contra la

Senadora Padilla Alvelo y el Senador De Castro Font.

Dicha querella  contenía 48 señalamientos específicos de

comportamientos y actuaciones de los Senadores.  Dicha

querella fue notificada con copia a los querellados.  El

licenciado Rivera Schatz también presentó ante el Comité

una querella en contra de las Senadoras Padilla Alvelo,

Arce Ferrer, así como en contra del Senador De Castro

Font.  Posteriormente, el licenciado Rivera Schatz

---

[43] <u>Cleveland Bd. Of Educ. v. Lauderhill</u>, 105 S.Ct. 1487, 1493 (1985).

[44] *Íd.*

presentó una segunda querella solicitando se extendiera al Senador Díaz Sánchez lo planteado en la originalmente instada por él contra los demás Senadores. Dichas querellas fueron notificadas con copia a los querellados.

El 25 de junio de 2007, las Senadoras Padilla Alvelo y Arce Ferrer, así como el Senador De Castro Font, presentaron *Contestación a Querella* en el Comité. Solicitaron, entre otras cosas, que se desestimara la querella presentada por el licenciado Rivera Schatz.

En esa misma fecha, las Senadoras Padilla Alvelo y Arce Ferrer, así como los Senadores De Castro Font y Díaz Sánchez presentaron *Contestación a Querella/Impugnación de Petición de Candidaturas y otros Extremos* en el Comité. Contestaron los 48 señalamientos que se les hicieron en la querella presentada el 19 de junio de 2007. Solicitaron, además, que se desestimara dicha querella y se les certificara como precandidatos a los puestos que solicitaban.

El 5 de julio de 2007, el Senador Díaz Sánchez, presentó *Contestación a Querella* en el Comité. Solicitó, entre otras cosas, que se desestimara la querella presentada por el licenciado Rivera Schatz.

Cada uno de los Senadores asistió a una vista ante el Comité, donde pudieron confrontar y argumentar las alegaciones en su contra, contra-interrogar testigos y defenderse.

El 9 de julio de 2007, el Comité emitió una extensa *Resolución* por unanimidad, determinando no cualificar a los Senadores para participar como aspirantes en la primaria interna del P.N.P. Se les apercibió, además, que de no estar conformes con la determinación, tenían un término de diez (10) días para solicitar del Comité una reconsideración.

De lo hechos anteriormente narrados, concluimos que no se violentó el debido proceso de ley de los Senadores. **Primero**, todos los Senadores fueron notificados por escrito de las querellas presentadas en su contra. **Segundo**, los Senadores contestaron por escrito todas las querellas presentadas en su contra. Anejaron a su contestación evidencia documental. **Tercero**, el Comité celebró vista en donde se le brindó la oportunidad a los Senadores, de presentar y refutar prueba y de estar asistidos por abogado. **Cuarto**, los Senadores acudieron y participaron de estas vistas. Tuvieron la oportunidad de presentar evidencia adicional y de refutar las alegaciones de las querellas presentadas en su contra y la evidencia documental que se acompañó con las mismas. **Quinto**, no se cuestionó la imparcialidad de los miembros del Comité. **Sexto**, el Comité les notificó por escrito de su decisión y les apercibió de su derecho de solicitar reconsideración. **Séptimo**, los Senadores no demostraron que la decisión del Directorio del P.N.P. no estuviera basada exclusivamente en el récord. **Octavo**, no se

cuestionó la imparcialidad de los miembros del Directorio, organismo que emitió la decisión de descalificación.

Entre los asuntos que todo **proceso** adversativo debe garantizar, para satisfacer las exigencias del **debido proceso** se encuentran precisamente, **la oportunidad de ser oído**; el derecho a contra-interrogar testigos y el derecho a examinar la evidencia presentada por la parte contraria.[45] A la luz de los antes expuesto, no hay duda alguna que el Comité cumplió con cada uno de los requisitos del debido proceso de ley.

Todos los Senadores, aquí peticionarios, participaron activamente en el proceso que se condujo ante el Comité. No es hasta que el Comité emite su resolución, que los Senadores cuestionaron su imparcialidad. Tampoco demostraron que la decisión del Comité no estuviera sostenida exclusivamente en el récord.

A la luz de este cuadro fáctico y procesal concluimos que el Comité no privó a los Senadores de su derecho a un debido proceso de ley a tenor con la Sección 7, Artículo II, de la Constitución de Puerto Rico.

C

*Intervención Judicial en Asuntos Internos de Partidos Políticos*

---

[45] Yuserdy Salva Santiago v. Jason Torres Padró, 2007 T.S.P.R. 101 (2007).

Los Senadores, aquí peticionarios, alegan, entre otras cosas, que el Tribunal de Primera Instancia antepuso el derecho de libertad de asociación del P.N.P. a los derechos y prerrogativas que la Carta de Derechos del Elector les garantiza. Indicaron, además, que el que un organismo de un partido político pueda determinar la descalificación de un aspirante a primaria, no necesariamente implica que cumplió con su obligación de imparcialidad e independencia de criterio, que es necesario para proteger el derecho al voto de los ciudadanos. Como resultado de esto, entienden, que erró el Tribunal de Primera Instancia al limitarse a examinar si la determinación del organismo calificador del partido no fue arbitraria y caprichosa. Arguyeron, que ello equivaldría a cambiar la intención legislativa y poner en manos de los partidos políticos lo que siempre se interesó estuviera fuera de su control. Sostuvieron, además, que intervenir con la decisión de no calificar a los Senadores no causa daño alguno al P.N.P. ya que no afectan las estructuras internas del partido ni su composición interna actual. No les asiste la razón. Veamos.

Como regla general, los tribunales rara vez intervienen en los asuntos internos de los partidos

políticos.    De  así  hacerlo,  se  debe  hacer  con  mucha

delicadeza y cuidado.[46]

    En Cullen v. Auclair, 714 A. 2d 1187, 1189 (1998), el

Tribunal Supremo del Estado de Rhode Island sostuvo lo

siguiente:

> **A   more   common   explanation   for   judicial
> restraint  in  entering  the  'political  thicket'  is
> the   belief   that   a   large   public   interest   is
> served   in   allowing   the   political   processes   to
> function     free     from     judicial     supervision.
> Therefore,     political     partiesare     generally
> recognized   to   have   certain   'inherent   powers   of
> self-government'   and   to   be   vested   with   wide
> discretion   to   interpret   and   decide   their   own
> regulations,   rules   and   disputes…Accordingly,   in
> determining   whether   a   particular   dispute   is   a
> nonjusticiable  political  matter,  the  focus   has
> been on  whether the dispute is an 'integral part
> of the   electoral  process'  or  merely  involves
> the  internal  affairs  of  the  political  party.**
> (Énfasis suplido y citas omitidas.)

    La Rama Judicial no tiene jurisdicción para intervenir

en controversias que son exclusivamente asuntos internos

de un partido político.[47]  Controversias internas de los

partidos políticos deben ser resueltas por los organismos

internos de la colectividad política.[48]  La expulsión de

miembros de una asociación voluntaria es de ordinario una

cuestión de disciplina interna con la cual los tribunales

no  deben intervenir.[49]

---

[46] O´Brien v. Brown, 409 U.S. 1, 4 (1972). *Véase*, también, Irish v. Democratic-Farmer-Labor Party of Minnesota, 399 F.2d 119 (CA8 1968).

[47] State Ex Rel. Holland v. Moran, 865 S.W. 2d 827, 832 (Mo. App. W.D. 1993; Carney v. Pilch, 30 Conn. Supp. 34, 296 A. 2d 687, 688 (1972).
[48] *Íd.*

En Democratic Party of The United States v. Wisconsin,

450 U.S. 107, 121-122; 101 S.Ct. 1010, 1019, (1981) el

Tribunal Supremo de los Estados Unidos expresó lo

siguiente:

> The First Amendment freedom to gather in
> association for the purpose of advancing
> shared beliefs is protected by the Fourteenth
> Amendment from infringement by any State…**And
> the freedom to associate for the "common
> advancement of political beliefs," necessarily
> presupposes the freedom to identify the people
> who constitute the association, and to limit the
> association to those people only.**
>
> ***
> **On several occasions this Court has recognized that the
> inclusion of persons unaffiliated with a political party
> may seriously distort its collective decisions—thus impairing
> the party's essential functions—and that political parties may
> accordingly protect themselves "from intrusion by those with
> adverse political principles"** (Énfasis Suplido y citas
> omitidas.)

En Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957),

el Tribunal Supremo de los Estados Unidos expresó lo

siguiente:

> **Any interference with the freedom of a party is
> simultaneously an interference with the freedom of its
> adherents.** (Énfasis suplido.)

En Democratic Party of The United States v. Wisconsin,

supra, el Tribunal Supremo de los Estados Unidos, citando

al tratadista constitucional Laurence H. Tribe,[50] añadió

lo siguiente:

> **Freedom of association would prove an empty guarantee if
> associations could not limit control over their decisions to
> those who share the interests and persuasions that underlie the
> association's being.** (Énfasis suplido.)

---

[49] Logia Adelphia v. Logia Adelphia, 72 D.P.R. 488, 503 (1951).

[50] L. Tribe, *American Constitutional Law*, 1ra ed., New York, Ed. The Foundation Press, Inc., 1978, pág. 791.

La libertad de asociarse con el fin de adelantar ideas políticas comunes, presupone necesariamente la libertad de identificar las personas que constituyen esa asociación y limitarla a esas personas solamente.[51]

En Alabama Republican Party v. Kelly McGinley, 893 So. 2d. 337, 346-347 (2004), el Tribunal Supremo del Estado de Alabama expresó lo siguiente:

> **The ultimate question is: who is the final arbiter of whether a potential candidate truly is, in the words of the Party's qualifying form, "in accord with, and endorse[s], the principles and policies of the Republican Party?"? For good or for ill, the answer must be the *Party itself,* not the courts and not every individual who desires to run for election as a Republican.**
>
> **However, it should be obvious that involvement in this issue—what is a political party's actual platform and who decides what it is—is something that courts must avoid. The inherently subjective judgment of the candidate committee as to the sincerity of a candidate's pledge, based on the facts in this record, falls well within the constitutionally permissible limits of the authority of a political party asserting its right to determine who may be associated with the party. No court should second-guess such a determination.** (Énfasis suplido.)

El derecho de los ciudadanos, en uso de su derecho a asociarse libremente con otras personas y a organizarse en grupos, en la figura de partidos políticos y presentar candidatos de su predilección para participar en el proceso electoral, tiene su origen en el fundamental derecho al sufragio, que es consustancial con la

---

[51] *Íd.*

existencia misma de nuestra democracia constitucional.[52]

Los partidos políticos son asociaciones de personas que creen en ciertos principios de gobierno, con el propósito de promover sus ideas políticas mediante la nominación de candidatos a puestos públicos; de controlar las estructuras gubernamentales; con el propósito de formular y poner en vigor política pública, a tenor con sus ideas y principios.[53] Una de sus funciones básicas es escoger los candidatos comprometidos con esas ideas y principios que van a representar a los ciudadanos que avalan con su voto las mismas.[54]

En Barceló v. Saldaña, Secretario Ejecutivo, 42 D.P.R. 226, 254 (1931) citando a Davis v. Hanbrick, 58 S.W. 779, 780 (1900), expresamos lo siguiente:

> **Los partidos políticos son asociaciones voluntarias para fines políticos. Son regidos por sus propios usos y establecen sus propias reglas. Los miembros de tales partidos pueden constituirlos, reorganizarlos, y disolverlos a su voluntad. Los electores que constituyen tal partido son, en verdad, el único cuerpo que puede finalmente determinar entre facciones u organizaciones rivales**. (Énfasis suplido.)

En Barceló v. Saldaña, Secretario Ejecutivo, *supra*, citando a Morrow v. Wipf, 115 N.W. 1121, 1126 y 1127, expresamos lo siguiente:

> **Los partidos políticos no son creaciones de la ley. Existen independientemente de los estatutos; y tienen poder inherente para reglamentar sus propios asuntos, sujetos solamente a aquellas restricciones legislativas que han sido legalmente enactadas.**

***

---

[52] Giménez v. J.E.E., 96 D.P.R. 943, 947 (1968).

[53] Dávila v. Sec. De Estado, 83 D.P.R 186, 194 (1960).

[54] Kusper et al. v. Pontikes, 414 U.S. 51, 58 (1973).

> **Los partidos políticos resultan de la asociación voluntaria de los electores. No existen por ministerio de ley; y poseen plenos poderes respecto a sus propios asuntos, en ausencia de reglamentación legislativa.**(Énfasis suplido.)

En <u>Tashjian v. Republican Party of Connecticut</u>, 479 U.S. 208, 214 (1986), el Tribunal Supremo de los Estados Unidos expresó lo siguiente:

> **The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization…As we have said, the freedom to join together in furtherance of common political beliefs necessarily presupposes the freedom to identify the people who constitute the association.**
>
> ***
>
> **Considered from the standpoint of the Party itself, the act of formal enrollment or public affiliation with the Party is merely one element in the continuum of participation in Party affairs, and need not be in any sense the most important.**(Enfásis suplido y citas omitidas.)

En <u>Eu. v. San Francisco County Democratic Central Committee</u>, 489 U.S. 214, 224 (1989), el Tribunal Supremo de Estados Unidos expresó lo siguiente:

> **Barring political parties from endorsing and opposing candidates not only burdens their freedom of speech but also infringes upon their freedom of association. It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments…<u>Freedom of association means not only that an individual voter has the right to associate with the political party of her choice…but also that a political party has a right to… "identify the people who constitute the association"…and to select a "standard bearer who best represents the party's ideologies and preferences"</u>.**
>
> ***
>
> **[A] political party's "determination…of the structure which best allows it to pursue its political goals, is protected by the Constitution." Freedom of association also encompasses a political party´s decisions about the identity of, and the process for electing, its leaders.**[55] (Énfasis suplido y citas omitidas.)

En <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 623 (1984), el Tribunal Supremo de los Estados Unidos expresó lo siguiente:

> **There can be no clearer example of an intrusion into the internal structure or affairs of an association that a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them**

---

[55] <u>Eu. v. San Francisco County Democratic Central Committee</u>, 489 U.S. 214, 224-226, 229 (1989).

**together.  Freedom of association therefore plainly presupposes a freedom not to associate.**(Enfásis suplido.)

En <u>Belluso v. Powthress</u>, 485 F. Supp. 904, 912 (D. Ga. 1960) el Tribunal de Distrito Federal para el Distrito Norte del Estado de Georgia expresó lo siguiente:

His claimed need to "associate" with an unwilling partner, the Republican party in Georgia, is not a first amendment right. **Indeed, to the degree that rights of association are implicated, we think these rights militate in favor of leaving a party free to limit access to its own primary ballot**.[56] (Enfásis suplido.)

La constitución y el reglamento interno de una asociación privada son un contrato entre los miembros o entre la asociación y sus miembros.[57]  Los partidos políticos son libres para adoptar sus propios procedimientos internos, limitados exclusivamente por las nociones de las garantías a la igual protección de la ley y el debido proceso de ley.[58]

Sobre este tema, el artículo *"Primary Elections and the Collective Right of Freedom of Association"*[59] de la revista jurídica de la Universidad de Yale expresó lo siguiente:

B.  *Participation in a Primary Election*

**The right of political association must include the power of a political party to seek a compromise among the varied interests of its adherents without**

---

[56] <u>Belluso v. Powthress</u>, 485 F. Supp. 904, 912 (D. Ga. 1960).

[57] <u>Logia Adelphia v. Logia Adelphia</u>, *supra*, pág. 496.

[58] <u>González Reyes v. Romero Barceló</u>, 114 D.P.R. 406, 414 (1983).

[59] Julia E. Guttman, <u>Primary Elections and the Collective Right of Freedom of Association</u>, 94 Yale Law Journal 117, 125-127 (1984).

**interference. A party's selection of its candidates plays a crucial role in striking such a balance among these interests: The primary election serves as a mechanism to determine the shared political ideals of party adherents by nominating those candidates that best express acceptable views on a wide range of issues. Any state interference with the party primary, including state-mandated inclusion of nonadherents, will distort the compromise struck between the varied interests of party adherents and therefore distort the party's determination of its shared political beliefs. Freedom of association bars such state control over a political party's determination of the content of its ideology.**

**Since control over participation in a primary can profoundly influence the content of the compromise emerging from the primary election, a political party's ability to define its boundaries cannot be separated from the party's ability to determine its political ideology. The right of political association, therefore, must protect the freedom of political party members to identify the people who constitute their association and to limit the association to those people. This includes the power to define membership or affiliation requirements in terms of commitment to shared party goals and the ability to determine whether would-be affiliates possess this commitment.**

**A political party's power to define its own boundaries is necessary to enable political party members to enjoy the advantages of association and to determine the content of their political speech. Together these powers create a constitutional right of political party adherents to conduct a primary free from the participation of nonadherents. The right to vote in a primary election thus vests only in individuals associated together in pursuit of shared political ideals.** (Enfásis suplido.)

El P.N.P. alegó, en su petición de descalificación ante el Tribunal de Primera Instancia, que los Senadores no cumplieron con los requisitos para ser candidatos, establecidos en la Ley Electoral de Puerto Rico y en su

reglamento, que violaron dicho estatuto, así como los reglamentos del P.N.P.

El Artículo 4.007 de la Ley Electoral de Puerto Rico, Ley Número 4 del 20 de diciembre de 1977, según enmendada, dispone sobre la forma y manera que se solicita ante el Tribunal de Primera Instancia, y se conducen los procedimientos ante ese foro, sobre la descalificación de un candidato a primarias de un partido político.  Sobre ese extremo dispone el referido estatuto lo siguiente:

> Todo partido político o candidato que interese descalificar [a] un candidato en primarias deberá radicar ante el Tribunal de Primera Instancia correspondiente una querella de descalificación debidamente jurada en [la] cual alegue ambos o alguno de los siguientes fundamentos:
>
> (1) Que el candidato no ha cumplido con los requisitos para ser candidatos establecidos en este subtítulo o su reglamento para las primarias con especificación de la sección de la ley o reglamento con la cual no se ha cumplido;
>
> (2) **que el candidato ha violado cualesquiera de las disposiciones de este título o de algún reglamento de la Comisión o <u>del partido</u>, con especificación de la sección violada,** y
>
> (3) que el candidato no cumple con alguna disposición constitucional al respecto.
>
> El candidato impugnado deberá contestar dicha querella, bajo juramento, dentro de lo diez (10) días de haberle sido notificada.
>
> Si el Tribunal de Primera Instancia encontrare que las alegaciones surge una controversia real, deberá citar a vista pública a ser celebrada dentro de los diez (10) días de haberse radicado la contestación del querellado. Dicho término podrá ser reducido por el Tribunal

de Primera Instancia, según lo requieran las circunstancias y la justicia del caso.[60] (Énfasis suplido.)

Sobre esos extremos el Artículo 4.017 del mismo estatuto dispone lo siguiente:

> Cualquier aspirante a ser nominado o cualquier candidato debidamente nominado podrá ser descalificado como tal por el Tribunal de Primera Instancia, cuando no hubiere cumplido con los requisitos impuestos por la Constitución o la ley, o cuando se demostrase que ha violado cualesquiera de las disposiciones de este subtítulo o de sus reglamentos.

> Radicada una petición de descalificación ante el Tribunal de Primera Instancia, se celebrará una vista en su fondo y el Tribunal deberá resolver de conformidad con los términos establecidos en la sec. 3016ª de este título.[61]

El Artículo 4.014 del mismo estatuto dispone que todo elector aspirante a una nominación para un cargo público electivo mediante el sistema de primarias debe figurar en el registro de afiliados del partido político que corresponda y **prestará juramento** ante Notario Público o funcionario autorizado a tomarlo **de que acatará el reglamento oficial de su partido político**, y de que cumplirá los requisitos constitucionales aplicables y con las disposiciones de tal estatuto.[62]

Los Senadores, aquí peticionarios nos plantean, como hemos expresado previamente, que el P.N.P. les violó su

---

[60] 16 L.P.R.A. sec. 3157.

[61] 16 L.P.R.A. sec. 3167.

[62] 16 L.P.R.A. sec. 3164.

prerrogativas a tenor con la Carta de Derechos del Elector.

El Artículo 2.001 de la Ley Electoral[63] dispone lo siguiente:

A los efectos de garantizar el libre ejercicio de la franquicia electoral, así como lograr la más clara expresión de la voluntad del pueblo, declaramos como válidos y esenciales lo siguientes derechos y prerrogativas;

(1) La administración de los organismos electorales del Estado Libre Asociado dentro de un marco de estricta imparcialidad, pureza y justicia.

(2) La garantía a cada persona del derecho al voto, igual, libre, directo y secreto.

(3) El derecho del ciudadano al voto íntegro, al voto mixto y al voto independiente bajo condiciones de igualdad en cada caso.

(4) El derecho del elector a participar en la inscripción de partidos y en la inscripción de candidaturas independientes.

(5) El derecho de los electores afiliados a participar en la formulación de los reglamentos internos y bases programáticas de sus respectivos partidos políticos, así como en los procesos de elección de las candidaturas de éstos.

**(6) El derecho de todo elector afiliado a disentir respecto de las cuestiones de su respectiva colectividad política que no sean de naturaleza programática o reglamentaria.**
**(7) El derecho de los electores afiliados al debido procedimiento de la ley en todo procedimiento disciplinario interno, al igual que en los procesos deliberativos y decisiones de sus partidos.**

**(8) El derecho del elector afiliado aspirante a una candidatura a solicitar primarias de su partido y la celebración de las mismas con arreglo a las garantías, derecho y procedimientos establecidos en este subtítulo.**

_____

[63] 16 L.P.R.A. sec. 3051.

(9) El derecho del elector afiliado a recibir información en relación con el uso que su partido dé a los fondos del mismo.

**(10) El derecho a la libre emisión del voto y a que éste se cuente y se adjudique de la manera en que el elector lo emita.**

**(11) La prevalencia de los derechos electorales del ciudadano sobre los derechos y prerrogativas de todos los partidos y agrupaciones políticas.**

La Comisión asumirá la función afirmativa de educar al elector sobre los derechos antes enunciados.

A tal fin, se concede por este subtítulo a los electores la capacidad para iniciar o promover cualesquiera acciones legales al amparo de esta Declaración de Derechos y Prerrogativas de los Electores ante el Tribunal de Primera Instancia que corresponda.

Diciembre 20, 1977, Núm. 4, p. 639, art. 2.001; Enero 10, 1983, Núm. 3, p. 385, sec. 29.[64] (Énfasis Suplido.)

Los Senadores, aquí peticionarios, prestaron juramento para participar en las primarias del P.N.P., celebradas el 9 de noviembre de 2003 y salieron electos en dichas primarias como candidatos al Senado de Puerto Rico frente a los comicios electorales de noviembre de 2004. Resultaron electos en dichos comicios generales al Senado bajo la insignia del P.N.P. con el compromiso contraído, como electores afiliados, en el referido juramento. El contenido de dicho juramento es el siguiente:

**Que acataré y cumpliré los reglamentos, acuerdos, y resoluciones aprobadas por los organismos rectores del partido.** (Énfasis suplido.)

---

[64] *Íd.*

Los Senadores, aquí peticionarios, prestaron juramento durante el mes de junio de 2007 con la intención de participar en las primarias del P.N.P. a celebrarse el 9 de marzo de 2008 como candidatos al Senado de Puerto Rico. El contenido de dicho juramento es el siguiente:

**Que acataré y cumpliré los reglamentos, acuerdos, y resoluciones aprobadas por los organismos rectores del partido.** (Énfasis suplido.)

El Artículo 4 del Reglamento para la Evaluación de Aspirantes a Cargos Públicos para Elecciones del P.N.P., aprobado el 20 de mayo de 2007, dispone los requisitos que debe cumplir todo aspirante a ocupar un cargo público por elección representando a los electores de dicha colectividad política. Dicha disposición reglamentaria reza de la forma siguiente:

A. Ser miembro bonafide del Partido Nuevo Progresista.

B. Ser elector inscrito.

C. Cumplir con las disposiciones constitucionales y legales aplicables al cargo al que aspira.

D. Cumplir con todos los requisitos de la Ley Electoral del 20 de diciembre de 1977, según enmendada, para aspirar a un cargo público por elección.

E. Cumplir con los requisitos del Reglamento de Primarias del Partido para el cargo que aspira.

F. No haber sido convicto por delito grave o menos grave que envuelva violencia o implique depravación moral o deshonestidad.

G. No estar envuelto en actividades contrarias a la ley, la moral o el orden público.

H. No haber sido destituido de cargo o puesto alguno en el servicio público por negligencia en el desempeño de su deber o por alguna otra causa que envuelve deshonestidad o la comisión de un acto criminal.

I. Haber cumplido con sus obligaciones contributivas durante los últimos 10 años.

J. De no haber sometido planillas de contribución sobre ingresos durante alguno de los últimos diez (10) años, deberá presentar una declaración jurada al Partido explicando satisfactoriamente, en detalle, la(s) razón(es) para no planilla para el (los) año(s) en cuestión.

K. De tener alguna deuda contributiva que no sea la correspondiente al segundo plazo de la contribución adeudando durante el año corriente, deberá someter evidencia de que tiene un plan de pago aprobado por el Departamento de Hacienda y de que está al día con dicho plan de pago.

L. No haber sido objeto de una recomendación, de destitución por la Oficina de Ética Gubernamental, la Comisión de Querellas Municipales, o haber sido separado permanentemente del ejercicio de su profesión por el Tribunal Supremo. Las Juntas Examinadoras de las diferentes profesiones y ocupaciones, la Oficina del Comisionado de Instituciones Financieras, el Comisionado de Seguros o cualquier otro organismo administrativo o judicial con facultad para ello.

M. En el caso de funcionarios públicos que aspiren a reelección o a algún cargo electivo, estar al día en la presentación de los informes requeridos por Ética Gubernamental.

N. No estar acusado en los tribunales de la comisión de un delito grave relacionado con el desempeño de un cargo público cuando la acusación surge de señalamientos hechos por la Oficina del Contralor.

O. No haber sometido al Partido información o declaraciones juradas cuyo contenido haya sido falso al momento de dicha información o declaración.

P. Someter el formulario requerido por el Partido, debidamente completado y juramentado, así como la documentación solicitada en dicho formulario o por el Comité de Evaluación, dentro de los términos dispuestos por el Reglamento del Partido, por el Directorio del Partido, por este Reglamento o por el Comité de Evaluación.

**Q. Comprometerse a respaldar y cumplir con la plataforma, todos los reglamentos, acuerdos, resoluciones y normas establecidas por (sic) Partido Nuevo Progresista.** (Énfasis suplido.)

El Artículo 5 del referido reglamento establece el procedimiento para la presentación y evaluación de solicitudes para aspirar a un cargo público por elección. Dicha disposición reglamentaria reza de la forma siguiente:

**A. Toda persona que aspire a un cargo público por elección tendrá que someterse a evaluación por el Comité de Evaluación designado por el Presidente del Partido y ratificado por el Directorio.**

**B. Los aspirantes presentarán su solicitud para participar en el procedimiento electoral o de selección correspondiente, en la Secretaría General del Partido, dentro del término fijado por el Partido por ello. El formulario deberá estar debidamente completado en todas sus partes, juramentado y acompañado de los documentos requeridos en el mismo.**

C. En caso de que el documento completado y presentado por el aspirante adolezca de alguna información subsanable, el aspirante será notificado de dicha deficiencia por escrito dentro de un término no mayor de cinco (5) días laborables luego de presentado el documento. El aspirante tendrá entonces un plazo de cinco (5) días laborables a partir de la fecha de notificación para subsanar la misma. De no subsanarse la deficiencia o explicar satisfactoriamente la misma a juicio del Comité de Evaluación, éste último podrá declarar no cualificado al aspirante. El término para subsanar cualquier deficiencia podrá ser ampliado por el Comité Evaluador *únicamente* por justa

causa y mediante solicitud del aspirante al Comité Evaluación. La solicitud para extender dicho término deberá ser presentada en la Secretaría del Partido antes de expirar el término cuya extensión se solicita.

**D. El Comité de Evaluación evaluará a los aspirantes y determinará si éstos cumplen con los requisitos establecidos por la Ley Electoral, el Reglamento del Partido y el Reglamento de Primarias del Partido Nuevo Progresista y cualquier otro aplicable para ocupar posiciones electivas por el Partido. La evaluación de los aspirantes se hará por el Comité de Evaluación en pleno o en secciones, según éste determine. No obstante lo anterior, todas las decisiones del Comité de Evaluación se harán por mayoría de los miembros del Comité en pleno.**

**E. El Comité podrá, a su discreción, citar y entrevistar al aspirante a fin de evaluar y hacer su recomendación sobre el aspirante.**

**F. El Comité podrá adoptar cualquier otra medida que entienda necesaria o conveniente para la evaluación y/o investigación de los aspirantes.**

**G. Una vez concluida la evaluación del aspirante, el Comité de Evaluación hará una determinación e informará de ello al Directorio con la recomendación de que tal designación sea ratificada. Las decisiones del Comité de Evaluación serán "Cualificado" o "No Cualificado".**

**H. En caso de que la decisión del Comité sea al efecto de que el aspirante no está cualificado, la misma expresará los fundamentos para ello. El aspirante tendrá un término jurisdiccional de diez (10) días para solicitar del Comité de Evaluación la reconsideración de la determinación o para solicitar una vista. La solicitud de reconsideración o vista deberá hacerse por escrito y presentarla a la Secretaría del Partido dentro del plazo antes fijo.**

I. Recibida la solicitud de reconsideración o de vista, el Comité de Evaluación tendrá un plazo de diez (10) días laborables para tomar acción sobre la misma o a su discreción, señalar una vista. El Comité de Evaluación podrá designar a un oficial examinador para que presida la vista y

someta al Comité de Evaluación su informe y recomendación. El aspirante podrá estar asistido por un abogado en cualquier vista fijada por el Comité de Evaluación. En los procedimientos y vistas ante el Comité de Evaluación no serán de aplicación las reglas de procedimientos ni las reglas de evidencia que rigen los tribunales.

Si el Comité de Evaluación no toma acción alguna sobre la solicitud de reconsideración o vista en el término de diez (10) días laborables, luego de su presentación, se entenderá que la misma ha sido declarada sin lugar de plano.

**J. En caso de que la decisión del Comité de Evaluación sea confirmando la determinación anterior de no cualificar al aspirante, o si éste no toma acción sobre la solicitud de reconsideración o vista dentro del término aquí fijado, el aspirante tendrá derecho a una apelación ante el Directorio del Partido.**

La apelación deberá ser presentada *por escrito* e incluirá las razones por las cuales el aspirante entiende que la decisión del Comité de Evaluación debe ser revocada. El escrito de apelación tendrá que presentarse a la Secretaría del partido *dentro del término jurisdiccional de cinco (5) días laborables* a partir de la fecha de recibo de la decisión del Comité de Evaluación declarando sin lugar la solicitud de reconsideración. Cuando el Comité de Evaluación no tomare acción sobre la solicitud de reconsideración, el término de *cinco (5) días laborables* para apelar ante el Directorio comenzará correr *al día número once (11)* luego de presentada la solicitud de reconsideración o vista ante el Comité de Evaluación.

La decisión del Directorio del Partido declarando con lugar o sin lugar la apelación será final e inapelable.

K. El Directorio del Partido podrá, en cualquier momento(sic) antes de una elección, No cualificar a un candidato de advenir a conocimiento del Partido que el aspirante ocultó información que debió haber incluido en el formulario de notificación de intención de aspirar, de candidato, o que dio información falsa o que el aspirante no cumple con los requisitos establecidos por la Ley o por este reglamento.(Énfasis suplido.)

La Asamblea General de Delegados del P.N.P. aprobó su
Reglamento Oficial el 4 de agosto de 2005. Su Declaración
de Propósitos expresa lo siguiente:

> Como Partido también consideramos valores
> esenciales **la máxima lealtad, el compromiso y la
> disciplina de los miembros, afiliados, oficiales
> y funcionarios electos bajo la insignia de la
> Palma. Nuestros reglamentos, esta Declaración de
> Propósitos, los acuerdos, las resoluciones y las
> decisiones del Partido garantizan a todos
> sus miembros amplia libertad para exponer
> sus puntos de vista, preferencias o
> recomendaciones ante los organismos de la
> colectividad. Pero una vez se produce la
> discusión de ideas y los asuntos son sometidos
> a votación, el deseo democrático de la mayoría
> se adopta como la posición institucional que
> debe ser respetada y defendida por todos los
> que voluntariamente pertenecemos a la
> colectividad. El Partido, como instrumento
> representativo y aglutinador de más de un millón
> de electores, siempre estará por encima de
> opiniones y consideraciones individuales.**
> (Énfasis suplido.)[65]

---

[65] La Declaración de Propósitos leía en el Reglamento
Oficial del P.N.P. aprobado el 26 de agosto de 2001 de la
forma siguiente:

> Como Partido también consideramos valores
> esenciales la máxima lealtad, el compromiso y la
> disciplina de los miembros, afiliados, oficiales
> y funcionarios electos bajo la insignia de La
> Palma. Nuestros reglamentos, esta Declaración de
> Propósitos, los acuerdos y las resoluciones del
> Partido garantiza a todos sus miembros amplia
> libertad para exponer sus puntos de vista,
> preferencias o recomendaciones ante los
> organismos de la colectividad. Pero una vez se
> produce la discusión de ideas y los asuntos son
> sometidos a votación, el deseo democrático de la
> mayoría se adopta como la posición institucional
> que debe ser respetada y defendida por todos los
> que voluntariamente pertenecemos a la
> colectividad. El Partido, como instrumento
> representativo y aglutinador de más de un millón
> de electores, siempre estará por encima de
> opiniones y consideraciones individuales.

El Artículo 5 de dicho cuerpo reglamentario dispone lo

siguiente:

Todo miembro del Partido aceptará y defenderá la Declaración de Propósitos y el     Programa    de Gobierno del Partido. Podrá, sin embargo, presentar sus propuestas, recomendaciones o posiciones individuales dentro de los  organismos correspondientes del Partido. No obstante, **siempre deberá acatar y defender la Declaración de Propósitos y el Programa de Gobierno vigente. A esos fines, toda persona que aspire a una posición electiva bajo la insignia del Partido en una elección general**, o que aspire a un cargo en el Directorio del Partido o   como Presidente de Comité Municipal o de     Precinto, **al presentar su intención como     aspirante deberá presentar una declaración de     fidelidad en la que hace constar su lealtad a la Declaración de Propósitos y al Programa de Gobierno del Partido.    La Declaración de Propósitos incluye la lealtad total a los principios de disciplina y respeto a los reglamentos de la colectividad, sus acuerdos y resoluciones de conformidad con el Artículo 8.** (Énfasis suplido.)[66]

_____

En el Reglamento aprobado el 4 de agosto de 2005, se añadió en la segunda oración, la frase "…*las decisiones del partido.*"

[66] El Artículo 5 leía en el Reglamento Oficial del P.N.P. aprobado el 26 de agosto de 2001 de la forma siguiente:

Todo miembro del partido aceptará y defenderá la Declaración de Propósitos y el Programa de Gobierno del Partido.  Podrá, sin embargo, presentar sus propuestas, recomendaciones o posiciones individuales dentro de los organismos correspondientes del Partido.   No obstante, siempre deberá acatar y defender el vigente.  A esos fines, toda persona que aspire a una posición electiva bajo la insignia del Partido en una elección general, excepto el Legislador Municipal, o que aspire a un cargo en el Directorio del Partido o como Presidente de Comité Municipal o de Precinto, al presentar su intención como aspirante deberá presentar una declaración de fidelidad en la que hace constar su lealtad a la Declaración de Propósitos y al Programa de Gobierno del Partido. La Declaración

El Artículo 8 de dicho cuerpo reglamentario dispone lo

siguiente:

> **Todo miembro del Partido acatará y cumplirá los reglamentos, acuerdos, resoluciones y Programa de Gobierno aprobados por los organismos rectores del Partido y servirá donde el Partido lo considere conveniente, conforme a su preparación, experiencia y capacidad, siempre en armonía con los dispuesto en este Reglamento. Se entenderá por "Reglamento de Partido" a éste y todos aquellos que emanen del mismo, incluyendo las resoluciones y acuerdos, y que sean aprobados por la Asamblea General, la Junta Estatal o el Directorio.**

> **Todo miembro del Directorio y la Junta Estatal, incluyendo a los funcionarios que obtuvieron cargos electivos bajo el emblema del Partido, tienen pleno derecho a expresar con absoluta libertad sus opiniones o preferencias ante los organismos del Partido a los que pertenece. Pero una vez el asunto es discutido y resuelto y habiéndose tomado una decisión democráticamente por votación mayoritaria del organismo concerniente, esta se convierte en la posición institucional del Partido, excepto si el organismo la reconsidera o un organismo de superior jerarquía adopta una distinta.**

> **Ningún oficial del Partido podrá menoscabar públicamente o tratar de imponer su criterio personal por encima de la posición institucional que se haya adoptado por el organismo correspondiente.**

---

de Propósitos incluye la lealtad total a los principios de disciplina y respeto a los reglamentos de la colectividad, sus acuerdos y resoluciones.

En el Reglamento aprobado el 4 de agosto de 2005, en la tercera oración se añadió la frase *"…Declaración de Propósitos y el Programa de Gobierno vigente."* En la última oración se añadió la frase *"…de conformidad con el Artículo 8"*. En el Reglamento del 2001, en la cuarta oración se eliminó la frase *"…excepto el Legislador Municipal…"*.

En casos de indisciplina evidente, temeraria o reiterada, el Directorio tendrá la obligación de censurar o suspender sumariamente de todos sus cargos en el Partido al oficial que así actúe, incluyendo el retiro de confianza. La suspensión podrá ser temporera o permanente. La decisión que así adopte el Directorio podrá ser apelada, a este organismo, por escrito presentado a la Secretaría dentro de los cinco (5) días a partir de la decisión del Directorio. La apelación resuelta por el Directorio será final y firme en todos los niveles del Partido. (Énfasis suplido.)[67]

_____

[67] El Artículo 8 aprobado el 26 de agosto de 2001, leía de la forma siguiente:

Todo miembro del Partido acatará y cumplirá los reglamentos, acuerdos y resoluciones aprobadas por los organismos rectores del Partido y servirá donde el Partido lo considere conveniente, conforme a su preparación, experiencia y capacidad, siempre en armonía con los dispuesto en este Reglamento. Se entenderá por "Reglamento de Partido" a éste y todos aquellos que emanen del mismo, incluyendo las resoluciones y acuerdos, y que sean aprobados por la Asamblea General, la Junta Estatal o el Directorio.

Todo miembro del Directorio y la Junta Estatal, incluyendo a los funcionarios que obtuvieron cargos electivos bajo el emblema del Partido, tienen pleno derecho a expresar con absoluta libertad sus opiniones o preferencias ante los organismos del Partido a los que pertenece. Pero una vez el asunto discutido es resuelto o adoptado democráticamente por votación mayoritaria del organismo concerniente, esa se convierte en la posición institucional del Partido. Ningún oficial del Partido podrá menoscabar públicamente o tratar de imponer su criterio personal por encima de la posición institucional que se haya adoptado por la colectividad. En casos de disciplina evidente, temeraria o reiterada, el Directorio tendrá la obligación de censurar o suspender sumariamente de su cargo al oficial que así actúe, incluyendo el retiro de confianza. La suspensión podrá ser temporera o permanente. La decisión que así adopte el Directorio podrá ser apelada, a este organismo, por escrito presentado a la Secretaría dentro de los cinco (5) días a partir de la decisión del Directorio. La apelación resuelta

El Artículo 33(b) de dicho cuerpo reglamentario dispone
lo siguiente:

> El Directorio tendrá las siguientes funciones y
> cualquier otra que emane de este Reglamento o
> determine la Asamblea General o la Junta Estatal.
>
> a.***
>
> b. **Será el principal custodio y responsable de la
> disciplina en el Partido, incluyendo la evaluación
> y la adjudicación de la lealtad, compromiso y
> respeto de todos los miembros hacia la Declaración
> de Propósitos, los reglamentos, resoluciones,
> acuerdos y compromisos programáticos que se hayan
> adoptado por votación mayoritaria.** (Énfasis
> suplido.)[68]

---

por el Directorio será final y firme en todos los
niveles del Partido.

En el Reglamento aprobado el 4 de agosto del 2005, en
la primera oración se añadió la frase *"…y Programa de
Gobierno…"*. La segunda oración, del segundo párrafo se
enmendó para que ahora leyera *"Pero una vez el asunto es
discutido y resuelto y habiéndose tomado una decisión
democráticamente por votación mayoritaria del organismo
concerniente esta se convierte en la posición
institucional del Partido, excepto si el organismo la
reconsidera o un organismo de superior jerarquía adopta
una distinta."* La primera oración, del tercer párrafo se
enmendó para que ahora leyera *"…por el organismo
correspondiente."* La primera oración, del cuarto párrafo
se enmendó para que ahora leyera *"…de todos sus cargos en
el Partido al oficial que así actúe, incluyendo el retiro
de confianza."*

[68] El Artículo 33(b) aprobado el 26 de agosto de 2001,
leía de la forma siguiente:

> Será el principal custodio de la disciplina en el
> Partido, incluyendo la evaluación y la
> adjudicación de la lealtad, compromiso y respeto
> de todos los miembros hacia la Declaración de
> Propósitos, los reglamentos, resoluciones,
> acuerdos y compromisos programáticos que se hayan
> adoptado por votación mayoritaria.

En el Reglamento aprobado el 4 de agosto de 2005, en la
primera oración, se añadió la frase *"…y responsable…"*.

El Artículo 45(c) de dicho cuerpo reglamentario dispone lo siguiente:

> **Los acuerdos de los Caucus, así como de la Conferencia Legislativa, se tomarán por mayoría. Estos acuerdos obligarán a todos los legisladores del Partido, independientemente de su posición personal en el seno del Caucus o de la Conferencia Legislativa, según sea el caso,** excepto, cuando los mismos sean contrarios a las disposiciones de este Reglamento, al Programa de Gobierno, a la Ley, la moral o el orden público. **El Caucus de cada Cámara, así como el Directorio, podrá tomar la acción disciplinaria que consideren adecuada contra cualquier legislador que viole los acuerdos del Caucus o de la Conferencia Legislativa.** (Énfasis suplido.)[69]

El Artículo 78 de dicho cuerpo reglamentario dispone lo siguiente:

> **No podrá ser aspirante ni candidato (a) a cargo público electivo aquella persona que no cumpla con todos los requisitos que establece la Ley Electoral, el Reglamento de Primarias del Partido y el Reglamento de Evaluación de**

---

[69] El Artículo 45(c) aprobado el 26 de agosto de 2001, leía de la forma siguiente:

Los acuerdos de los Caucus, así como de la Conferencia Legislativa se tomarán por mayoría. Estos acuerdos obligarán a todos los legisladores del Partido, independientemente de su posición personal en el seno del Caucus o de la Conferencia Legislativa, según sea el caso, excepto, cuando los mismos sean contrarios a las disposiciones de este Reglamento, a la Ley, la moral o el orden público. El Caucus de cada Cámara, así como el Directorio, podrá tomar la acción disciplinaria que consideren adecuada contra cualquier legislador que viole los acuerdos del Caucus o de la Conferencia Legislativa.

En el Reglamento aprobado el 4 de agosto del 2005, en la segunda oración se añadió la frase *…al Programa de Gobierno…*.

**Candidatos(as)** o que haya sido convicto(a) de delito grave o menos grave, que implique depravación moral o deshonestidad o que se dedique a actividades contrarias a la moral o a la ley, o que esté inhabilitado por ley para ocupar el cargo que aspire.

Aquel candidato o aspirante contra quien el Partido haya radicado un proceso de descalificación de candidatura en el Tribunal, será relevado por el Directorio de toda posición en el Partido al momento de radicarse la demanda.

**No podrá ser aspirante o candidato aquella persona que no haya cumplido con la Declaración de Propósitos, resoluciones, reglamentos, acuerdos adoptados por la Asamblea General; y que haya sido sancionado de forma sumaria y permanente, según el Reglamento del Partido.**

No podrá aspirar a ocupar la presidencia de un organismo, según definido por el Título III, Artículo II, exceptuando el punto 3 del inciso II "Comité de Sectores" o ser designados(as) para ocuparla, personas que hayan estado involucradas en conducta que impliquen depravación moral o uso de fondos públicos para lucro personal o que hayan sido destituidos de puestos públicos por elección o designación en el Gobierno de Puerto Rico o de los Estados Unidos.

Ningún funcionario(a) remunerado(a) del Partido o cualquiera de sus organismos, podrá postularse a puesto electivo. (Énfasis suplido.)

El Artículo 98(a) de dicho cuerpo reglamentario dispone

lo siguiente:

*\*\*\**

**Toda aquella persona que desacate una decisión de la Asamblea General no podrá figurar como candidato bajo la insignia del Partido, ni ocupar posiciones de liderato.** (Énfasis suplido.)

La Ley Electoral, en su Artículo 4.007, *supra*, permite

que un partido político o candidato que interese

descalificar un candidato en primarias de esa

colectividad política presente ante el Tribunal de

Primera Instancia una querella de descalificación debidamente jurada en la cual alegue, entre otras cosas, que el candidato ha violado cualesquiera de las disposiciones de algún reglamento de su partido político. Por otro lado, ese mismo estatuto en su Artículo 4.014, *supra*, obliga a todo aspirante a una nominación a un cargo público por elección mediante el sistema de primarias a estar registrado como elector afiliado del partido político que corresponda y a prestar juramento de que acatará el reglamento oficial de su partido político, entre otras cosas. Los Senadores, aquí peticionarios, prestaron juramento, para participar en las primarias celebradas el 9 de noviembre de 2003 y en el mes de junio de 2007 para participar en las primarias a celebrarse el 9 de marzo de 2008, de que acatarían y cumplirían no solo los reglamentos del P.N.P. sino también los acuerdos y resoluciones aprobadas por los organismos rectores de esa colectividad política.

El 4 de agosto de 2005, el P.N.P., al aprobar a través de su Asamblea General de Delegados su Reglamento Oficial, en su Declaración de Propósitos, formuló como valores esenciales la máxima lealtad, el compromiso y la disciplina de sus miembros, electores afiliados, y funcionarios electos, entre otros. No obstante, se estableció como prerrogativa de todos sus miembros, y así se obligó como institución a garantizarlo, amplia libertad para exponer sus puntos de vista, preferencias o

recomendaciones ante los organismos y foros de la colectividad. Por otro lado, obligó a todos sus miembros, que pertenecen voluntariamente a esa colectividad política, a que una vez, en uso de su libertad, expongan sus puntos de vista, preferencias o recomendaciones dentro de los organismos y foros internos del partido a respetar y defender la voluntad democrática de la mayoría. Una vez se produce la discusión de ideas ante los organismos y foros internos del P.N.P. y los asuntos considerados, discutidos y debatidos son sometidos a votación, la voluntad democrática de la mayoría, se adopta como la posición institucional, que a su vez obliga a todos sus miembros y tiene que ser respetada y defendida por los mismos. La condición de miembro o elector afiliado de un partido político es voluntaria. No obstante, tal condición está sujeta a la adhesión, compromiso, lealtad y disciplina con las posiciones institucionales de esa colectividad política. En su Artículo 5, tal reglamento le impone la obligación a **todo miembro del partido** a aceptar y defender la Declaración de Propósitos del partido, entre otros. Le impone la obligación, a todo elector afiliado que aspire a una posición electiva bajo su insignia en una elección general, a prestar una declaración de fidelidad (juramento) al presentar su intención como aspirantes, en la que tiene que hacer constar su compromiso con los principios contenidos en la referida Declaración de

Propósitos, que incluye su lealtad total a los principios de disciplina y respeto a los reglamentos de la colectividad, sus acuerdos y resoluciones. Los Senadores, aquí peticionarios, hicieron tal compromiso en ambas declaraciones de fidelidad, previamente relacionadas.

**El Artículo 8 del referido reglamento le impone la obligación a todo miembro del partido a acatar y cumplir los reglamentos, acuerdos, resoluciones y Programa de Gobierno aprobados por los organismos rectores del partido. Dispuso que se entiende por "Reglamento de Partido" a éste y todos aquellos que emanen del mismo, incluyendo las resoluciones y acuerdos que sean aprobados por la Asamblea General, la Junta Estatal o el Directorio.**

El Artículo 45(c) del referido reglamento impone la obligación de todos los legisladores electos bajo su insignia, independientemente de su posición personal en el seno del *Caucus* o de la Conferencia Legislativa, a respetar y defender los acuerdos de esos dos organismos tomados por mayoría. El *Caucus* de cada Cámara legislativa, así como el Directorio pueden tomar la acción disciplinaria que consideren adecuada contra cualquier legislador que viole los acuerdos del *Caucus* o de la Conferencia Legislativa. Los legisladores del P.N.P. tienen amplia libertad, que les garantiza la Declaración de Propósitos del Reglamento Oficial de esa colectividad política, para exponer sus puntos de vista,

preferencias o recomendaciones ante el seno del *Caucus* o de la Conferencia Legislativa. No obstante, una vez se adopta por mayoría la posición institucional del partido obliga a todos los miembros del *Caucus* o de la Conferencia Legislativa, según sea el caso. El Artículo 33(b) delega en el Directorio del P.N.P. la autoridad disciplinaria sobre todos sus miembros, incluyendo la evaluación y adjudicación de la lealtad, el compromiso y respeto de éstos hacia la Declaración de Propósitos, los reglamentos, resoluciones, acuerdos y compromisos programáticos que se hayan adoptado por votación mayoritaria.

El Artículo 78 del referido reglamento dispone que no podrá ser aspirante a una candidatura electiva en las primarias del P.N.P., a celebrarse el 9 de marzo de 2008 o candidato por ese partido político en las elecciones generales de noviembre de 2008, aquella persona que no cumpla con todos los requisitos que establece, entre otras cosas, el Reglamento de Evaluación de Candidatos. Este último dispone en el Artículo 4, inciso Q, que los aspirantes deben comprometerse a respaldar y cumplir con la plataforma, todos los reglamentos, acuerdos, resoluciones y normas establecidas por esa colectividad política. Dispone, además, el Artículo 78 que no podrá ser aspirante a un puesto electivo en las primarias del P.N.P. o candidato a ningún puesto electivo en las elecciones generales de noviembre 2008 por ese partido

político, aquella persona que no haya cumplido con la Declaración de Propósitos, resoluciones, reglamentos, o acuerdos adoptados por la Asamblea General. Sobre esos extremos, añade el Artículo 98(a), que toda persona que desacate una decisión de la Asamblea General del P.N.P. no podrá figurar como candidato bajo su insignia, ni ocupar posiciones de liderato.

El Comité de Evaluación de Candidatos del P.N.P. concluyó, a base del récord y los hechos probados ante sí, que los Senadores aquí peticionarios, a partir de enero del año 2005 incurrieron en conducta temeraria y lesiva al P.N.P. Que no acataron, respetaron y defendieron decisiones tomadas por la mayoría del *Caucus* del P.N.P. en el Senado de Puerto Rico. Que crearon una alianza con Senadores de otros partidos, despojando al P.N.P. y a su delegación en el Senado de la mayoría legislativa que obtuvieron en las urnas el 2 de noviembre de 2004. Que con sus actuaciones se colocaron al margen del P.N.P., así como también en contraposición política, reglamentaria y programática a esa colectividad política, en violación a su declaración de fidelidad (juramento) prestada en el año 2003, y a las normas que delinean la conducta de los miembros afiliados, a tenor con los Artículos 5 y 8 del Reglamento Oficial del P.N.P.

Determinó el Comité que el *Caucus* en el Senado del P.N.P. y los organismos rectores de esa colectividad, de mayor representación de sus miembros afiliados,

decidieron por mayoría y en forma democrática, que los intereses políticos, estratégicos, reglamentarios y programáticos de esa colectividad estarían mejor servidos otorgando la Presidencia del Senado al Presidente del P.N.P.

Concluyó el Comité que los Senadores, aquí peticionarios, promovieron, junto a legisladores de partidos políticos de minoría y de oposición, la aprobación de legislación cuyo contenido era considerado por el P.N.P. como lesivo al pueblo de Puerto Rico, como su posición oficial e institucional. Ejemplo de ello es la tasa contributiva sobre las ventas y servicios impuestos por ley, en contraposición a la pública y ferviente oposición institucional del P.N.P. Determinó, que todo ello para complacer a los senadores de los partidos políticos minoritarios de oposición que los mantienen en sus posiciones de liderato en el Senado.

Concluyó, además, que los Senadores, aquí peticionarios, carecen de credibilidad por haber violado su propia declaración de fidelidad. Determinó, que son electores afiliados al P.N.P. por conveniencia momentánea para adelantar sus aspiraciones personales de reelección. Pretenden volver a utilizar la insignia y los recursos de esa colectividad política sin el compromiso real y efectivo de representar a sus electores afiliados en los principios e ideales políticos que le son comunes. Determinó, además, que el P.N.P. no prestará su emblema o

insignia a aspirantes o candidatos que actúen por conveniencia personal y en perjuicio político, reglamentario y programático de la colectividad política a la que juraron lealtad y fidelidad institucional.

Finalmente concluyó, que los Senadores, aquí peticionarios, no cumplen con los requisitos de idoneidad, valores, principios, compromisos, lealtades y fidelidad a las posiciones políticas de naturaleza institucional del P.N.P. por haber violado los Artículos 5, 8 y 45 del Reglamento Oficial de esa colectividad política.

Recomendaron al Directorio del P.N.P. no cualificar la intención de los Senadores para participar en las primarias a celebrarse el 9 de marzo de 2008, como aspirantes a las candidaturas a escaños al Senado de Puerto Rico por mediar violaciones claras y evidentes de esas personas a los Artículos 5, 8 y 45 del Reglamento Oficial del P.N.P. El Directorio acogió las recomendaciones del Comité, inclusive aquella de no considerarlos miembros afiliados de esa colectividad política.

El Tribunal de Primera Instancia concluyó que la decisión del Directorio del P.N.P., en relación con su determinación sobre la violación de parte de los Senadores, aquí peticionarios, a las disposiciones reglamentarias de esa colectividad política, por falta de disciplina, lealtad y compromiso de su parte hacia la

Declaración de Propósitos de su cuerpo reglamentario y por no acatar la decisión de la Asamblea General no fue arbitraria ni caprichosa. Reconoció lo actuado por el P.N.P. como un ejercicio de su derecho fundamental a la libertad de asociación, y de su prerrogativa de regular y de cualificar la intención de personas de aspirar a candidaturas bajo la insignia de esa colectividad, para representar sus electores afiliados y divulgar su plataforma, mensaje, ideología y programa.

Lo dictaminado por el Tribunal de Primera Instancia, que avaló lo actuado por el Directorio del P.N.P. está cobijado bajo la presunción de corrección. Los Senadores, aquí peticionarios, no han rebatido en forma alguna tal presunción. No han colocado a este Tribunal en posición de intervenir con la sentencia dictada por el foro primario.

Las prerrogativas contenidas en la Carta de Derechos del Elector no le brindan un derecho absoluto a un miembro afiliado a un partido político a participar en sus primarias. Un elector afiliado **tiene el derecho** a disentir respecto de las cuestiones de su respectiva colectividad política que no sean programáticas o reglamentarias, o sea de naturaleza institucional. **Tiene el derecho** a un debido procedimiento de ley en todo procedimiento disciplinario interno, al igual que en los procesos deliberativos y decisiones de su partido. **Tiene el derecho** a aspirar a una candidatura, a solicitar

primarias y a la celebración de las mismas con arreglo a las garantías, derecho y procedimientos establecidos en la Ley Electoral de Puerto Rico. No obstante, a tenor con el Artículo 4.007 de la Ley Electoral, *supra*, **tiene que cumplir** con los requisitos establecidos en la Ley Electoral y su reglamento. Puede ser descalificado como tal, de determinarse **que ha violado cualesquiera de las disposiciones de la Ley Electoral, de algún reglamento de la Comisión Estatal de Elecciones o de su partido político**, Artículo 4.007 de la Ley Electoral, *supra*. Tendrá, además, que prestar una declaración de fidelidad, bajo juramento, de que acatará el reglamento oficial de su partido político. Al violar esa declaración de fidelidad ofrecida bajo juramento infringe el Artículo 4.014 de la Ley Electoral, *supra*, y podría también ser descalificado como aspirante a una candidatura en unas primarias.

Los Senadores, aquí peticionarios, violaron los acuerdos del *Caucus* del P.N.P. en el Senado que fueron adoptados por mayoría de sus miembros, y por ende violaron la declaración de fidelidad que prestaron bajo juramento para poder aspirar a una candidatura al Senado de Puerto Rico en las primarias celebradas el 9 de noviembre de 2003. Esos acuerdos los obligaban a ellos, independientemente de su posición personal en el seno del *Caucus*. Al así actuar quedaron expuestos a la acción disciplinaria que el Directorio del P.N.P. considerara

adecuada; Artículo 45(c) del Reglamento Oficial del P.N.P. También violaron los acuerdos tomados por la Asamblea General del P.N.P. violando tal declaración de fidelidad, quedando expuestos igualmente a la acción disciplinaria de ese organismo.

Al desacatar los acuerdos de la Asamblea General y del *Caucus* del P.N.P. en el Senado los Senadores no cualificaron para participar en las primarias de ese partido político; Artículos 45(c), 78 y 98(a) del Reglamento Oficial del P.N.P.

Existe un interés público de gran importancia en Puerto Rico, dimanante del esquema democrático constitucional que vivimos, que impone y exige la restricción judicial al determinarse cual es el cuadro de aspirantes en una primaria interna de un partido político y los candidatos que deben figurar en su papeleta electoral, frente a los comicios generales celebradas en Puerto Rico cada cuatro (4) años. Ese interés público está mejor servido en permitir que tal proceso político electoral interno de los partidos políticos opere y funcione libre de la intervención judicial. Los tribunales solo habrán de intervenir cuando medien violaciones crasas a derechos individuales de naturaleza constitucional o estatutaria que obstaculicen o impidan la función representativa y democrática de los partidos políticos en nuestra democracia constitucional.

Los partidos políticos poseen determinadas facultades de gobierno propio y están investidos con una amplia discreción para formular e interpretar su reglamentación interna y resolver sus disputas al amparo de la misma.

La libertad de asociarse en la forma de partidos políticos, para la promoción y el progreso de creencias, valores, principios e ideales políticos comunes necesariamente presupone la libertad de identificar las personas que constituyen esa asociación, a base de esos valores, principios e ideas políticas comunes. La participación de personas en los procesos internos de naturaleza política electoral que no estén comprometidos con los mismos, y han violado declaraciones de fidelidad prestadas bajo juramento a esos efectos, afecta y distorsiona sus decisiones y acciones colectivas, perjudicando seriamente las funciones esenciales y fundamentales de los partidos políticos, de naturaleza representativa, dentro de nuestra democracia constitucional. Concluimos que los partidos políticos tienen la facultad y el poder de protegerse de la penetración o intrusión interna de creencias, valores, principios e ideas políticas adversas a su asociación. Cualquier interferencia o intrusión con la libertad de asociación, sobre la base de las creencias, valores y principios e ideales políticos comunes de un partido político es simultáneamente una interferencia o intrusión con la misma libertad de sus miembros afiliados.

La libertad de asociación resultaría en una garantía hueca y sin valor alguno en nuestra democracia constitucional si los partidos políticos no pudieran limitar la participación, y tener el control de sus decisiones colectivas, a través de aquellos que comparten las creencias, valores, principios e ideales políticos que constituyen su asociación.

¿Quién es el árbitro final sobre si un aspirante a una candidatura al Senado de Puerto Rico en las primarias internas de un partido político, de conformidad con los valores y requisitos que establece esa misma organización, a tenor con la ley, está cualificado para participar en las mismas? Concluimos, que el propio partido político, no los tribunales, así como tampoco cualquier persona que desee aparecer en la papeleta de esa colectividad política. Los Tribunales podemos intervenir con los asuntos de un partido político cuando se violan derechos individuales de naturaleza constitucional o estatutarios que obstaculicen o impidan la operación y funcionamiento de nuestra democracia constitucional, de naturaleza representativa. Tal asunto descansa plenamente dentro de los límites constitucionales permisibles de la actividad de los partidos políticos sobre quien puede representar efectivamente y eficientemente las creencias, valores, principios e ideales políticos de su asociación. Los tribunales no tienen, por impedimento constitucional,

facultad alguna para formular opinión o adjudicar tal asunto.

No existe un ejemplo más claro de una interferencia o intrusión indebida del Estado en los procesos políticos electorales internos de un partido políticos que una reglamentación o decisión judicial que obligue a esa colectividad política a aceptar la intención de participar de personas en sus primarias cuando esa organización entiende que no cualifican para ello, a tenor con sus creencias, valores y principios. Tal acción del Estado interfiere, impide y hasta obstaculiza la habilidad de sus miembros afiliados de expresar y promover aquellos valores y puntos de vista comunes que los llevaron a asociarse. Tal libertad milita a favor de permitir a los partidos políticos a limitar únicamente el acceso a sus primarias internas a aquellas personas que representan sus creencias, valores, principios e ideales políticos y a excluir de dicho proceso político electoral interno a aquellas que no.

El derecho constitucional a libremente asociarse a base de criterios políticos incluye el poder y la facultad de un partido político de requerir y obtener un compromiso de sus miembros afiliados, mediante una declaración de fidelidad juramentada sobre las creencias, valores, principios e ideales políticos formulados democráticamente por la asociación, por mayoría, independientemente de la variedad de intereses

individuales que tengan éstos. Incluye, el exigirles a sus miembros afiliados la no interferencia de sus intereses personales con los intereses y asuntos comunes de la asociación.

El control de un partido político sobre la participación de personas en sus primarias internas influencia profundamente la sustancia y el contenido del compromiso de los candidatos que resultan victoriosos en ese proceso político electoral. La capacidad y habilidad de un partido político de definir sus fronteras no puede ser separada en forma alguna de su capacidad y habilidad para determinar y formular sus valores, principios e ideales políticos. El poder y la facultad de los partidos políticos de definir sus propias fronteras es necesario e indispensable para habilitar a sus miembros afiliados en el disfrute de las ventajas de tal asociación, y para determinar el contenido de su discurso político. El ejercicio en conjunto de esos poderes y facultades viabilizan el disfrute del derecho de los miembros afiliados de un partido político a conducir el procedimiento interno de primarias, libre de la interferencia de la oposición política, o aún de aquellas personas que no comparten o no están comprometidas con las creencias, valores y principios de la asociación.

Al examinar un estatuto es deber y obligación ineludible de los Tribunales el lograr interpretaciones congruentes y compatibles con el espíritu y esquema

democrático de la Constitución de Puerto Rico.[70]   Al interpretar las partes antes mencionadas de la Ley Electoral de Puerto Rico, debemos imprimirle sentido y valor real a la libertad de asociación que tienen los partidos políticos y sus miembros, como instrumento de la democracia constitucional, de naturaleza representativa que vivimos.

### III

Por todo lo antes expuesto disentimos del curso de acción tomado por la Mayoría.


                              *Efraín E. Rivera Pérez*
                                  *Juez Asociado*

---

[70] <u>Nogueras v. Hernández Colón</u>, 127 D.P.R. 405 (1990).